UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

               v.

JOHN MENSCH,

                  *Defendant.*

No. 24 Cr. 334 (NJC)

## SENTENCING MEMORANDUM ON BEHALF OF JOHN MENSCH

Dated: December 1, 2025
      New York, NY

MORVILLO ABRAMOWITZ GRAND
  IASON & ANELLO P.C.

Robert J. Anello
Jeremy H. Temkin
Peter Menz
565 Fifth Avenue
New York, NY 10017
Tel: (212) 856-9600

*Attorneys for John Mensch*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ............................................................................................................... 5

   I.    JOHN'S LIFE IS ONE OF SERVICE AND HARD WORK ........................... 5

      a.   John is Born into the School Bus Business........................................................... 5

      b.   John Makes Sacrifices to Provide for His Family................................................. 8

      ██████████████████████████████████████████████

      d.   John Perseveres Through Divorce and Builds a Blended Family..................................11

      e.   John Makes a Difference ███████████████ Through the Special Olympics ....................................................................................................... 13

   II.   JOHN'S LIFE IN THE SCHOOL BUS BUSINESS ......................................... 15

      a.   After Struggling to Find His Path, John Lost His Father and a Role Model ............... 15

      b.   John Builds The School Bus Companies ......................................................... 17

      c.   A Significant New Opportunity Turns to Disaster for the School Bus Companies ...... 17

      d.   Loan Sharks Destroy John's Business ........................................................... 19

  III.   THE OFFENSE CONDUCT ......................................................................... 23

      a.   The School Bus Companies' Dire Financial Situation....................................... 23

      b.   The School Bus Companies Begin Writing Intracompany Checks .......................... 24

      c.   The School Bus Companies Continue to Rely On These Checks as Their Financial Position Deteriorates ........................................................................ 25

  IV.   JOHN REBUILDS THE SCHOOL BUS COMPANIES............................... 28

      a.   John's Decades of Experience Uniquely Qualify Him to Handle the Distinct Challenges of the School Bus Transportation Business................................................ 29

      b.   In The Face of Devastating Adversity, John Succeeded Where Others Failed............. 34

   V.   THIS PROSECUTION'S IMPACT ON JOHN, HIS FAMILY, AND THE SCHOOL BUS COMPANIES ..................................................................... 38

DISCUSSION ................................................................................................................ 40

   I.    RELEVANT LAW ....................................................................................... 40

   II.   THE GUIDELINES CALCULATION ......................................................... 41

  III.   JOHN'S HISTORY AND CHARACTERISTICS COUNSEL IN FAVOR OF A NON-CUSTODIAL SENTENCE .......................................................... 43

      ████████████████████████████████████████████████

    b.    Hundreds of Employees and Tens of Thousands of Students Depend on John ............ 46

IV.    THE ROLE OF THE USURIOUS HARD MONEY LENDERS FURTHER
    SUPPORTS A NON-CUSTODIAL SENTENCE........................................................ 50

V.    A NON-CUSTODIAL SENTENCE WILL ENABLE JOHN TO PROVIDE
    MEANINGFUL RESTITUTION ............................................................................... 52

VI.    A SENTENCE OF INCARCERATION WOULD NOT SERVE THE PURPOSES
    OF SPECIFIC OR GENERAL DETERRENCE ......................................................... 53

    a.    John Has Little Need for Specific Deterrence and a Low Risk of Recidivism............ 53

    b.    A Non-Custodial Sentence Will Serve the Purposes of General Deterrence ................ 55

VII.    A SENTENCE OF INCARCERATION WOULD CREATE UNWARRANTED
    SENTENCING DISPARITIES.................................................................................... 57

CONCLUSION..................................................................................................................... 59

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Fleetwood Services, LLC v. Ram Capital Funding, LLC,*
   2022 WL 1997207 (S.D.N.Y. Jun. 6, 2022)..............................................................20
*Gall v. United States,*
   552 U.S. 38 (2007) ..............................................................................................41
*In re GMI Group, Inc.,*
   606 B.R. 467 (Bankr. N.D. Ga. 2019) ..................................................................20
*In re JPR Mechanical Inc.,*
   2025 WL 1550541 (Bankr. S.D.N.Y. May 30, 2025) ...........................................20
*Koon v. United States,*
   518 U.S. 81 (1996) ..............................................................................................41
*Lateral Recovery, LLC v. Capital Merchant Services, LLC,*
   632 F. Supp. 3d 402 (S.D.N.Y. 2022) .................................................................20
*People by James v. Richmond Capital Group LLC,*
   80 Misc.3d 1213(A) (Sup. Ct. N.Y. Cty. Sep. 15, 2023) ...............................19, 20
*United States v. Blarek,*
   7 F. Supp. 2d 192 (E.D.N.Y. 1998) .....................................................................41
*United States v. Booker,*
   543 U.S. 220 (2005) ............................................................................................40
*United States v. Burnell,*
   367 F. Supp. 3d 12 (E.D.N.Y. 2019) ...................................................................54
*United States v. Carrasquillo,*
   2013 WL 3466538 (E.D.N.Y. May 21, 2013).......................................................54
   ██████████████████ .........................................................................44
*United States v. Gardellini,*
   545 F.3d 1089 (D.C. Cir. 2008) ...........................................................................55
*United States v. Gorodetsky,*
   288 F.R.D. 248 (E.D.N.Y 2013) .....................................................................46, 49
*United States v. Khalid,*
   2011 WL 6967993 (E.D.N.Y. Dec. 13, 2011) .....................................................46
*United States v. Leonard,*
   37 F.3d 32 (2d Cir. 1994)....................................................................................42
*United States v. Marsh,*
   820 F. Supp. 2d 320 (E.D.N.Y. 2011) .................................................................52
   ██████████████████ .........................................................................44
*United States v. Maxwell,*
   118 F.4th 256 (2d Cir. 2024)...............................................................................40
*United States v. McCarthy,*
   2023 WL 3741996 (E.D.N.Y. May 30, 2023)..........................................52, 54, 55

*United States v. McKenzie,*
   2023 WL 1861286 (S.D.N.Y. Feb. 9, 2023) ........................................................... 54
*United States v. Milikowsky,*
   65 F.3d 4 (2d Cir. 1995)......................................................................... 3, 43, 46
*United States v. Mullings,*
   131 F. Supp. 3d 1 (E.D.N.Y. 2015) ....................................................................... 55
   ████████████████ █████ ................................................................. 44
*United States v. Romano,*
   2008 WL 4427759 (E.D.N.Y. Sept. 16, 2008)...................................................... 46
*United States v. Rizzo,*
   349 F.3d 94 (2d Cir. 2003)...................................................................................... 43
*United States v. Somerstein,*
   20 F. Supp. 2d 454 (E.D.N.Y. 1998) ..................................................................... 49
   ████████████████ █████ ................................................................. 44
*United States v. Toback,*
   2005 WL 992004 (S.D.N.Y. Apr. 14, 2005) .......................................................... 49
*United States v. Turner,*
   629 F. App'x 66 (2d Cir. 2015)............................................................................... 54

**Federal Statutes**
18 U.S.C. § 371............................................................................................................ 41
18 U.S.C. § 3553........................................................................... 41, 43, 52, 53, 57, 58

**United States Sentencing Guidelines Provisions**
U.S.S.G. § 2B1.1........................................................................................................ 41
U.S.S.G. § 3B1.1.................................................................................................. 41, 42
U.S.S.G § 3E1.1.......................................................................................................... 41

**State Regulations and Statutes**
N.Y. Penal Law § 190.40 ........................................................................................... 20
N.Y. Vehicle & Traffic Law § 19-A ......................................................................... 56
N.J. Admin Code § 13-20-30.14 ................................................................................ 56

**Other Authorities**
National Institute of Justice, "Five Things About Deterrence" (May 2016) ............... 55

**TABLE OF SENTENCING LETTERS TO JUDGE CHOUDHURY**

| Exhibit | Document |
|---------|----------|
| 1 | Letter from John Mensch |
| 2 | Letter from Jennifer Thomas (Wife) |
| 3 | Letter from Kelsey Mensch (Daughter) |
| 4 | Letter from Jacob Mensch (Son) |
| 5 | Letter from Mitchell Beattie (Son-in-law) |
| 6 | Letter from Caleigh Thomas (Stepdaughter) |
| 7 | Letter from Jennifer Mensch (Ex-wife) |
| 8 | Letter from Mary Mensch (Mother) |
| 9 | Letter from Karen Coady (Cousin) |
| 10 | Letter from Michael Mensch (Uncle) |
| 11 | Letter from Joseph Cervone (Client Contact and Former Employee) |
| 12 | Letter from Kristen Dainty (Client Contact) |
| 13 | Letter from Nicole Weidenbaum (Client Contact) |
| 14 | Letter from Brian Devincenzi (Client Contact) |
| 15 | Letter from Denise McGarty (Employee) |
| 16 | Letter from Marjorie Collier (Employee) |
| 17 | Letter from Teresa Pecorella-Logan (Employee) |
| 18 | Letter from Sergo Jovin (Employee) |
| 19 | Letter from Jack Potere (Friend) |
| 20 | Letter from Ellen Schuster (Friend) |
| 21 | Letter from James Andruss (Friend) |
| 22 | Letter from ███████████ (Friend) |
| 23 | Letter from Marcus LaPiana (Friend) |
| 24 | Letter from Philip Vignola (Friend) |
| 25 | Letter from Father Paul Tolve (Friend) |
| 26 | Letter from Dr. Kenneth J. Malone (Friend) |

## TABLE OF ADDITIONAL EXHIBITS

| Exhibit | Document |
|---------|----------|
| 27 | New York Attorney General Notice |
| 28 | Federal Trade Commission Notices |
| 29 | Email Obtained Through New York Freedom of Information Law Request |
| 30 | Agreement with Wallkill Valley Federal Savings & Loan |
| 31 | Agreement with Dime Community Bank |

<u>**PRELIMINARY STATEMENT**</u>

This memorandum respectfully is submitted on behalf of John Mensch, who will stand before this Court for sentencing on December 30, 2025. John, who grew up working in his father's school bus yard, has spent his life serving students, families, and school districts. For nearly fifteen years, he has run a group of small companies providing student transportation to school districts in New York and New Jersey (the "School Bus Companies"). As the letters submitted by his clients, employees, friends, and family demonstrate, John is a hands-on, mechanically minded person who regularly works double-digit hours to keep the School Bus Companies running, whether that means working with a school district to take over a contract on an emergency basis or stepping in to rescue buses carrying students when they break down.

The school bus transportation business always has been a difficult, low-margin industry, with operators having to manage both the high costs of vehicle debt and the unreliability of municipal budgets. Eight years ago, the School Bus Companies were in serious financial trouble due to a significant contractual dispute with their largest school district client. In order to stay afloat, the cash-strapped School Bus Companies unfortunately began relying on predatory "hard money lenders" to finance their operation, ultimately paying millions of dollars in usurious interest to lenders who subsequently were charged with unlawful lending by the Federal Trade Commission, the New York Attorney General, and the New Jersey Attorney General. The School Bus Companies were expressly identified as victims in those cases. With the School Bus Companies' slender profit margins eliminated by these criminally usurious lenders (or, as one New York judge correctly called them, "loan sharks"), their precarious financial position became disastrous. Believing that the School Bus Companies could weather the storm and that he could save his employees' jobs, John made what he now recognizes was the biggest mistake of his life: together with the School Bus Companies' newly-hired chief financial officer, Dr. Majosefina

Jacinto, he deposited intracompany checks into the School Bus Companies' bank accounts at two different banks. Because both banks offered immediate check-clearing (even before funds had been received from the drawing bank), this enabled the School Bus Companies to withdraw funds they did not have to pay their corporate obligations.

In commencing this activity, John did not intend to impose any losses on the banks, and although he was the sole owner of the School Bus Companies, he did not seek to line his own pockets. He naively believed that the School Bus Companies' financial distress could be cured, that their operations could be rescued, and that the "float" of checks between the two banks could eventually be paid off through legitimate sources. As a result of the combined pressures of the criminally usurious lenders, the continuing contract dispute with the School Bus Companies' largest school district, and the costs and expenses associated with the School Bus Companies' many other contracts, John ultimately realized that he had no choice but to put the School Bus Companies into bankruptcy, which he did in September 2018. ███████████████

████████████████████████████████████████████████

██████████████████████████████████

John deeply regrets his role in this conduct and recognizes that it was wrong from the start. He is ashamed of the harm that he inflicted on two banks. He has demonstrated his remorse not simply through his timely guilty plea, but through his pre-sentencing commitment to repay the victim banks, who already have received over $1.8 million in restitution. For all the reasons set forth below, counsel respectfully suggest that a non-custodial sentence and a

_____

requirement that John continue to make full restitution to the victim banks, is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Two separate aspects of John's history and characteristics weigh in favor of this sentencing proposal. First, since the offense conduct ended more than seven years ago, John has made extraordinary strides to rebuild the School Bus Companies, to the benefit of hundreds of employees, tens of thousands of students, and the many communities the School Bus Companies serve. John led the School Bus Companies through bankruptcy, the COVID-19 pandemic, and a nationwide bus driver shortage. Today, the School Bus Companies serve over twenty different school districts; transport 33,000 students on a daily basis; and employ approximately 750 drivers, monitors, and other workers. Many of the students that the School Bus Companies serve are homeless or have special needs, requiring specialized or even personalized transportation services. These employees, school districts, and vulnerable students depend on John, who is essential to the continued success of the School Bus Companies. John is unique in having spent a lifetime in the school bus industry, and through those decades of experience has become "the only individual with the knowledge, skill, experience, and relationships to run [the School Bus Companies] on a daily basis." *United States v. Milikowsky*, 65 F.3d 4, 8 (2d Cir. 1995). No one other than John ever has run the School Bus Companies, and no guarantee exists that they can survive in his absence. The critical role played by John strongly militates in favor of a non-custodial sentence—particularly in light of the need to ensure meaningful restitution, which is best accomplished by the continued operation of the School Bus Companies.

████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

[REDACTED]

Without minimizing John's responsibility for his conduct, in assessing the nature and circumstances of the offense, we ask the Court to recognize that John, who chose the wrong course to solve his problems, was nevertheless victimized by the hard money lenders, who not only personally threatened John with ruin, but significantly exacerbated the circumstances that led to the offense conduct and continued to abuse the School Bus Companies throughout the relevant period. State and federal regulators have since recognized that the School Bus Companies were victims of these loan sharks, one of whom returned to unlawful lending after being granted clemency by President Trump.[2]

Nor is a custodial sentence necessary to achieve specific or general deterrence. Over the past seven years, John has demonstrated genuine remorse for his conduct and has focused on

---

[2] "Jonathan Braun, whose sentence was commuted by Trump, accused in civil suits of making high-interest loans in violation of court order," NEWSDAY, Oct. 31, 2025, available at https://www.newsday.com/long-island/crime/jonathan-braun-high-interest-loans-sentence-ftc-trump-aa4vcn13.

repaying the banks and rebuilding the School Bus Companies by doing what he does best: serving schools, students, and parents.  Under such circumstances, no need for specific deterrence exists.  Moreover, the substantial financial penalties that will accompany John's sentence, in combination with the collateral consequences and public shaming that he has already experienced, are more than sufficient to accomplish the goal of general deterrence.

Finally, a non-custodial sentence is supported by the need to avoid unwarranted sentencing disparities.  As described further below, one case from this district—*United States v. Khan*, No. 13 Cr. 268 (E.D.N.Y.)—is instructive.  In 2014, faced with a similar Guidelines calculation and similar conduct, Judge Dearie recognized that the defendant had acted not out of greed or with the desire to inflict substantial harm, but out of a misguided desire to save his business and its employees.  Judge Dearie thus imposed a non-custodial sentence to allow the defendant to effectuate full restitution to the victim banks.   Counsel respectfully submits that *Khan* serves as a meaningful point of comparison to assess an appropriate sentence in this case.

For all of these reasons, and as explained in more detail below, the Court should impose a sentence of probation and order that John make full restitution for the offense (as he has begun and committed to do through written agreements with both banks).

## BACKGROUND

### I.     JOHN'S LIFE IS ONE OF SERVICE AND HARD WORK

#### a.    John is Born into the School Bus Business

John Mensch was born in Brookhaven, New York in 1970, the youngest of five children. PSR ¶ 40.[3]  He was raised in Mastic Beach and has lived in Suffolk County his entire life.  *Id.* ¶ 51.  Friends recall John as a happy, active child who loved playing sports.  PSR ¶ 42; Ex. 25,

---

[3] Citations to the PSR refer to the document dated October 4, 2025.  Citations to "PSR Add." refer to the Addendum dated November 25, 2025.

Father Tolve Letter at 1.[4]  Although he was not academically strong, from an early age he distinguished himself with his work ethic and motivation.

As the youngest child, John developed a close relationship with his parents, especially after his older brothers and sisters went to college.  PSR ¶ 42.   John was particularly close to his father, who owned a small business—Montauk Bus—that provided transportation services to local school districts.  *Id.* ¶¶ 40, 42. John idolized his father.  Father Paul Tolve, a Catholic priest who has known John since he was 14, recalls that John "always confided in [his father], sought his counsel and advice, and wanted to walk in his footsteps as closely as possible."  Ex. 25, Father Tolve Letter at 1.

As a teenager, John began working for Montauk Bus before and after school, helping his father with mechanical work and other hands-on tasks around the bus yard.  PSR ¶ 42.  Even before he had his driver's license, John drove school buses around the bus yard for refueling or repairs.  He soon began helping with repairs as well, learning how to fix buses and other mechanical issues from his father.  Through these early experiences, John developed a hands-on understanding of Montauk Bus's operations, giving him practical knowledge that he uses to this day.  As a business associate recalls, "John learned the bus business from his father who he admired more than just a father but as his mentor."  Ex. 19, Jack Potere Letter at 2.

John always has had an extraordinary work ethic.  To earn extra money in high school, he started working at a gas station.  His employer, Jack Potere, owned multiple gas stations in Long Island and employed "hundreds of people" during his 21 years in the business.  Ex. 19, Jack Potere Letter at 2.  Mr. Potere writes that "without hesitation, John was one of the best

---

[4] Letters submitted to the Court by John and his family, friends, employees, and clients are attached as Exhibits ("Ex.") 1 through 26.

employees I ever had." *Id.* As he describes in his letter to the Court, John was "[c]ourteous and friendly to the customers, took direction easily, and always looked to do the extra work where other employees did not." *Id.*

John briefly attended college at Clarkson University. PSR ¶¶ 21, 60. Campus life was difficult for him. Having never done well in the classroom, John struggled academically, including barely passing his introductory accounting class with a 66. *Id.* ¶ 21. His college classmate, Jim Andruss, recalls that while other students were distracted by socializing, "John was more focused on productivity and living with intention." Ex. 21, Jim Andruss Letter at 1. When other students attended hockey games to cheer on the team, John volunteered with the facilities staff to "ensure that the events were a success." *Id.* John's work ethic left a lasting impression on Mr. Andruss, who remains John's friend to this day. *Id.* at 2 ("I've always admired his relentless drive…. [John's] the type who's up before dawn, not for show, but out of an internal sense of purpose.")

After one semester, John withdrew from Clarkson and began working full-time for Montauk Bus, with his father giving him the responsibility of managing the Springs Union Free School District contract. PSR ¶¶ 21, 60, 67. John "was in charge of the whole contract, wherein he assisted with driving the buses, dispatching buses, routing the buses, and mechanical work." *Id.* ¶ 67. After a year of work, his father encouraged him to return to Clarkson, but John again left after one semester, realizing that college was not for him and that the bus business was his true passion. *Id.* ¶ 60. Just as he had done as a teenager, John continued to learn about every aspect of the school bus business from his father.

### b. John Makes Sacrifices to Provide for His Family

John married Jennifer Novak in his early 20s. PSR ¶ 43. The couple had three children: Kelsey, Thomas, and Jacob. PSR ¶¶ 43-44. As John's friends and family describe in their letters, John always has prioritized his role as a father. Ex. 9, Karen Coady Letter at 1 ("His children's well-being has always been his top priority, often putting their needs above his own."); Ex. 10, Michael Mensch Letter at 1 ("I have watched John grow into a devoted and selfless parent to his three children: Kelsey, Jacob, and Thomas."); Ex. 23, Marcus LaPiana Letter at 1 ("I have witnessed the devotion he has to his family, taking time from his very busy schedule to make sure he gets to spend quality time with each of his 3 children.")

His first wife, Jennifer, recalls that she and John "shared all the typical challenges that parents face while rearing a young family." Ex. 7, Jennifer Mensch Letter at 1. As the family's primary provider, John spent many hours working. His daughter, Kelsey, recalls that the challenges of running a small business often meant her father was working early in the morning, late at night, and on the weekends. Ex. 3, Kelsey Mensch Letter at 1 ("When I was young, my dad was always working… His dedication to building multiple businesses meant sacrificing time at home, but I always understood that his hard work was in service of our family.")

John's commitment to work, however, never took precedence over his devotion to his family. ██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████





[REDACTED]

### d. John Perseveres Through Divorce and Builds a Blended Family

In 2014, John and his first wife divorced. PSR ¶¶ 43, 46. Their first priority was their children. *Id.* ¶ 46. Friends and family recall that during the separation, "John never wavered on his commitment to his children [REDACTED] Ex. 19, Jack Potere Letter at 2. Kelsey Mensch praises John for his efforts "to have honest conversations" with her about her thoughts on her parents' separation. Kelsey notes that her relationship with John was strengthened by "my father's ability to reflect on his actions, lean into his emotional vulnerability, and grow as a parent and human." Ex. 3, Kelsey Mensch Letter at 1-2. Jacob Mensch likewise praises his father for ensuring that their relationship never grew distant or strained, as his father "always made the time we spent together meaningful" and "put in the effort to make me feel seen and heard." Ex. 4, Jacob Mensch Letter at 1.

In 2023, John married Jennifer Thomas, who he had begun dating several years after his divorce. PSR ¶ 47. [REDACTED]

As the letters submitted to the Court make clear, John treats his two stepchildren with the same love, care, and commitment as his own children. Ex. 23, Marcus LaPiana Letter at 1 ("I have

also witnessed the love and friendship that he shares with his wife, and his wife's kids, treating her children just like one of his own.") Caleigh Thomas, Jennifer's daughter, remains immensely grateful for John's love and support, recalling how John reorganized his home so she could have her own space when she unexpectedly needed to move in during the COVID-19 pandemic. Ex. 6, Caleigh Thomas Letter at 2. Caleigh recognizes that she is "extremely lucky" to have a stepfather like John. *Id.* at 1.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████

**e. John Makes a Difference** ██████████████████ **Through the Special Olympics**

John's compassionate nature and generosity are widely recognized by his friends and family. ████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

John also has devoted substantial time and effort to the Special Olympics community. ██

██████████████████████████████████████████████████

██ As the letters to the Court make clear, John is a remarkable and caring coach. According to Ellen Schuster, a fellow coach and the mother of a son with special needs, John builds a real

bond with the many children he coaches.  Ex. 20, Ellen Schuster Letter at 1 ("[T]hey know that he encourages and pushes them to grow in the sport but they also know that he cares so much about them.").  When Jennifer Thomas ██████████████████████████████████████████ ████████████████ John impressed her with his "ease with all the students and patience that he displayed with all their different abilities."  Ex. 2, Jennifer Thomas Letter at 1.  ████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

John's services in support of the Special Olympics are not limited to coaching.  When the local Special Olympics team needed to travel to swim competitions across New York state or in the tristate area, John provided bus transportation, sometimes even driving the buses himself.  *See* Ex. 20, Ellen Schuster Letter at 1; Ex. 19, Jack Potere Letter at 2 ("There were swimming meets in Connecticut and New Jersey where John took his own bus and he himself drove the team to the meet.  That kind of character and devotion to your children cannot be taught.")  When a special needs athlete in New York City was left without travel options before a competition, John went to the city and personally drove the athlete to the event.  Ex. 19, Ellen Schuster Letter at 1.  John also helped the team acquire swimming equipment, including team swimsuits.  *Id.*  John even worked with his friend Phil Vignola, whose daughter attended SUNY Maritime College, to secure an Olympic-sized pool at that institution for a Special Olympics event.  Ex. 24, Phil Vignola Letter at 1.  As ████████████ notes, John is an "asset to the community" and "an asset to the Special Olympics program as he gives his time effortlessly and without looking for thanks, he just does it because it's the right thing to do."  Ex. 22, ████ ████████████ at 1.

In 2022, John was selected as a coach for the Special Olympics National Swim Competition, a ten-day event in Florida.  As a coach, John was responsible for 24-hour supervision of the New York state swim team, which included "training and coaching the athletes and escorting them through their days," including "activities, meals and bus transportation to the event sites."  Ex. 20, Ellen Schuster Letter at 1-2.  ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████  In her letter to the Court, Ms. Schuster praises John for this work, writing that he "always made the experiences joyful" and that his "commitment and energy has been wonderful for our team and all the athletes he comes across in the world of the Special Olympics."  Ex. 20, Ellen Schuster Letter at 1-2.

## II.    JOHN'S LIFE IN THE SCHOOL BUS BUSINESS

### a.  After Struggling to Find His Path, John Lost His Father and a Role Model

In 1997, John's father's company, Montauk Bus filed for bankruptcy.  At this time, John started running his own school bus transportation business (Seacoast Transportation Services).  PSR ¶ 21.  When oil prices rose in the early 2000s, Seacoast failed as well, ultimately dissolving in 2002.  Such failures are not uncommon in the privately operated school bus business.  Industry experts have noted that school transportation contractors must deal with numerous operational costs, which "impact short-term operations, financial stability, succession planning, negotiations with school districts, and long-term sustainability."[5]  Many private contractors are "small family

---

[5] See American Student Transportation Partners, "How to Navigate Rising Costs in School Transportation,"  Aug. 7, 2024, available at https://astpartners.com/2024/08/how-to-navigate-rising-costs-in-school-transportation/.

owned and operated businesses,"[6] with low margins that are susceptible to shocks from fuel prices, inflation, or other external forces.[7]

John then pursued other small businesses in the Long Island area before returning to Montauk Bus in 2007. John relished the opportunity to work with his father again. He took on any role that needed doing, whether it be repairing and driving buses, interfacing with school districts, or preparing bids for new contracts.

Sadly, shortly after John returned to Montauk Bus, his father was diagnosed with colon cancer. During this crisis, John demonstrated his devotion to his parents. John started driving his parents from Suffolk County to Manhattan where his father was receiving treatment. Ex. 8, Mary Mensch Letter at 1. His mother recalls that "as my husband spent his last six weeks in the hospital, John would be [at] his bedside every morning at 5:00 a.m. until another family member could get in to be with Dad." *Id.* Mr. Potere, who knew John's father as a customer in his gas stations, remembers that "John would travel every day into the city to see his father, comfort him, bathe him […] whatever needed to make those last moments easier." Ex. 19, Jack Potere Letter at 2. John's acts of love and care left a significant impression on Mr. Potere, who writes that "We all pray that someday we have children too that are as devoted to us as John was to his father." *Id.*

_____

[6] *See* National School Transportation Association, Comment Letter re Docket No. FMCSA-2025-0115 (Jul. 29, 2025), available at https://yellowbuses.org/Portals/0/xBlog/uploads/2025/8/1/toFMCSAreElectronicDVIRs2025-07-29Cfinal.pdf.

[7] "How Skyrocketing Fuel Prices Are Hurting Schools," Education Week, Mar. 17, 2022, available at https://www.edweek.org/leadership/how-skyrocketing-fuel-prices-are-hurting-schools/2022/03 ("David Chiverella [who owned a Pennsylvania school bus company] [has] been driving school buses for more than four decades—but now he's pondering whether to shut down the business after the school year ends in June. 'It got bad back in 2008, but it's nothing like the way it is now, and we don't see any relief in the future,' he said.")

### b. John Builds The School Bus Companies

After his father's death in 2010, PSR Add. ¶ 40, John felt lost. Father Tolve recalls that John talked to his father "every week to seek his counsel and advice about life, family and business" and that John struggled after his father's death. Ex. 25, Father Tolve Letter at 1. Additionally, John and his siblings disputed who should continue to run the family business. Ultimately, these struggles caused John to leave his father's company.

Over the next four years, John started and built the School Bus Companies through hard work and outstanding customer service. PSR ¶ 63. John's strength always has been on the operations side of the business. John interfaced with the school districts to arrange for the safe and timely transportation of students, often stepping in to drive buses himself when needed. *Id.* ¶ 21. He also ensured that the buses were operating properly, including ordering parts, coordinating the maintenance schedules, and working with the maintenance staff to repair buses. *Id.*

### c. A Significant New Opportunity Turns to Disaster for the School Bus Companies

In 2016, the School Bus Companies bid for and won a five-year contract to service the William Floyd School District (WFSD), which had 8,500 students. PSR ¶ 21. The WFSD contract was the largest that the School Bus Companies had ever won, with expected annual gross revenues of $15 million. *Id.* In addition to the financial boon this contract promised, serving the WFSD had special meaning for John. His three children all attended public schools in the WFSD, and his father's company had served the WFSD years before. To John, winning this contract meant living up to his father's legacy. He was hopeful that this contract would help a small, striving company grow to new heights. Instead, it did the opposite.

To service the WFSD contract, the School Bus Companies needed to expand significantly both their workforce and their bus fleet, which required substantial investment. John recognized that neither he nor his existing staff were qualified to build the School Bus Companies' finance function and guide them through this necessary growth. *Id.* To address these issues, John hired Dr. Jacinto to serve as the School Bus Companies' Chief Financial Officer. *Id.* ¶¶ 6, 21.

John knew Dr. Jacinto from her tenure as the CFO of his father's company, Montauk Bus. Not only was he familiar with her past work, John knew that she had a Ph.D., held a CPA license, and even taught accounting at local colleges. Understanding that she was an experienced accountant and had been a trusted advisor to his father, John entrusted the School Bus Companies' fiscal well-being to her. John continued to focus his energy on the operations of the business, spending a significant amount of his time on the road, driving buses and managing the School Bus Companies' relationships with their school district customers. In the end, John's decision to hire Dr. Jacinto and to follow her advice regarding funding sources contributed to the circumstances underlying the offense conduct.

Shortly after the School Bus Companies began servicing the WFSD, the WFSD began taking aggressive positions on what services were covered by the contract, withholding payment for essential services that the School Bus Companies were providing. PSR ¶ 21. Specifically, WFSD refused to pay the School Bus Companies to transport buses from the schools back to the yard in the morning and from the yard back to the schools in the afternoon, taking the position that because no students were on the buses, these were "deadhead miles". The WFSD similarly refused to pay the hourly wages of approximately 80 bus monitors while they were being transported to the bus yard after morning drop-off and to the school for afternoon pick-up. As such, the School Bus Companies had to bear these costs, insofar as they could not leave the

monitors at school for the full day. Compounding these problems, the WFSD reorganized and consolidated certain bus routes, cutting services for which the School Bus Companies had expected to be compensated.

### d. Loan Sharks Destroy John's Business

The School Bus Companies' primary assets were the school buses themselves, all of which were purchased with financing from vehicle and equipment lenders and were subject to security interests. As traditional lenders were unwilling to provide further financing, given the fully leveraged condition of the School Bus Companies, Dr. Jacinto began pursuing private, "hard money" lenders. PSR ¶ 21. John was unfamiliar with these lenders, as the School Bus Companies had not used hard money loans before Dr. Jacinto began working there. Initially, John accepted Dr. Jacinto's judgment that taking on these loans was necessary and appropriate.

"Hard money lenders" purport to provide "merchant cash advances." In theory, they purchase a specified percentage of a small business's future revenues, to be repaid in installments as revenues come in. Because the small business's revenues may be less than expected, the hard money lender is supposed to take the risk that repayment will not be possible, making the instrument different from a loan. As John soon would learn, the "hard money lenders" functioned very differently in practice. In the words of a New York state judge, these lenders are "loan sharks who perpetrated a massive fraud on desperate merchants." *People by James v. Richmond Capital Group LLC*, 80 Misc.3d 1213(a), at *2 (N.Y. Cty. Sup. Ct. Sep. 15, 2023).

As a condition of the advances, the lenders were given direct access to the School Bus Companies' bank accounts, allowing them to initiate ACH payments without further authorization. Using this authority, they took a fixed amount—on a daily or weekly basis—from the School Bus Companies' bank accounts, without regard to the School Bus Companies'

significant economic distress.[8]  Although the interest rate was not disclosed in the loan

documents, given the speed at which these mandatory payments were made, the effective annual

interest rate usually exceeded 65% and sometimes exceeded 150%.  These rates of interest are

far greater than the 25% per annum rate rendered criminal under New York's usury law. *See* N.Y.

Penal Law § 190.40.  Making matters worse, the loan sharks also deducted so-called "bank fees"

and other charges from the amount they were advancing, further increasing the effective interest

rate.  For example, in early September 2017, the School Bus Companies took out a loan from

Yellowstone Capital LLC ("Yellowstone").  Although the contract documents provided for a cash

advance of $400,000, the School Bus Companies only received $370,000.  Over the course of the

next several months, the School Bus Companies were debited approximately $572,000 by

Yellowstone.  Thus, through this single loan, Yellowstone collected over $200,000 in interest in a

matter of months—resulting in an effective annual interest rate of approximately 140%.

These onerous and usurious payment terms were not the only deceptive and unfair

measures employed by the hard money lenders.  Unbeknownst to John, many of the "hard money

lenders" actually were affiliated with one another, although they presented themselves as

---

[8] As such, the cash advance agreements were effectively loans.  Many state and federal courts
who have evaluated the contracts used by the Bus Companies' hard money lenders have reached
this conclusion.  *In re JPR Mechanical Inc.*, 2025 WL 1550541, at *9 (Bankr. S.D.N.Y. May 30,
2025) ("These economic features, most fundamentally the reality that the Debtor bears the risk of
non-collection of receivables with Radium2 bearing little if any of that risk, powerfully show the
Agreements to be loans."); *Fleetwood Services, LLC v. Ram Capital Funding, LLC*, 2022 WL
1997207, at *11 (S.D.N.Y. Jun. 6, 2022) ("Although on its face the Agreement purports to
provide for the sale of accounts receivables, that is just window dressing."); *Lateral Recovery,
LLC v. Capital Merchant Services, LLC*, 632 F. Supp. 3d 402, 458 (S.D.N.Y. 2022) ("Although
the agreement is nominally one for the sale of receivables, that is a matter of label or form only;
the substance is a loan."); *In re GMI Group, Inc.*, 606 B.R. 467, 489 (Bankr. N.D. Ga. 2019)
("[T]he Agreement [used by Unique Funding Solutions, LLC] constitutes a criminally usurious
loan under applicable New York law"); *People by James v. Richmond Capital Group LLC*, 80
Misc.3d 1213(A), at *10 (Sup. Ct. N.Y. Cty. Sep. 15, 2023) ("[A]ll factors lead to the inescapable
conclusion that the MCAs were loans.")

independent businesses.  Some used these obscure corporate structures to charge even more fees

to the School Bus Companies.  For example, when the School Bus Companies took out a loan

from Radium2 Capital in August 2017, they obtained the loan through a broker at iAdvance

Now, which later charged John a fee of $13,449 for "connecting you with a working capital

company."  Unbeknownst to John, iAdvance Now and Radium2 Capital were operated by the

same person, such that iAdvance Now effectively was charging a fee for connecting the School

Bus Companies with itself.[9]  iAdvance Now charged similar fees on four subsequent loans that

the School Bus Companies took out from Radium2 Capital.

     The loan sharks enforced these onerous payment terms by requiring merchants to sign

confessions of judgment at the time of funding, which permitted the lender to reduce any unpaid

debt to a judgment without notice to the merchant.  John signed these confessions of judgment in

his personal capacity as well as on behalf of the School Bus Companies.  Although technically

legal, loan sharks used these confessions of judgment aggressively and abusively, using the threat

of filing the judgments to coerce payments.  One "hard money lender" whose company lent money

to John threatened a rabbi who had also borrowed money, threatening to "make [the rabbi]

bleed."[10]  Loan sharks personally threatened John, stating that they would file these judgments

against John, then take his business and his house, and to leave him and his family out on the street.

When John asked one lender about excessive fees being charged, the lender texted him: "You know

---

[9] John is only aware of this affiliation because the owner of Radium2 Capital pleaded guilty to honest services wire fraud in November 2024.  In advance of his sentencing, the owner disclosed the fact that he operated both iAdvance Now and Radium2 Capital.  *See* Government's Sentencing Memorandum, *United States v. Troy Caruso*, No. 23 Cr. 654, ECF 86 at 10-11 (S.D.N.Y. Feb. 21, 2025).

[10] *See* Michael S. Schmidt et al, "A Troubling Trump Pardon, and a Link to the Kushners," N.Y. Times, Nov. 26, 2023, available at https://www.nytimes.com/2023/11/26/us/politics/trump-pardon-braun.html.

how this game works and if you where [sic] dealing with some other company they would've filed there [sic] Ucc already or possibly a Coj [confession of judgment]."

This aggressive use of confessions of judgment gave the loan sharks significant leverage. At one point, a dispute arose between Dr. Jacinto and a lender shortly after the School Bus Companies took out the loan, such that the School Bus Companies quickly returned the funds that had been advanced to them. John, however, already had signed a confession of judgment and delivered it to the hard money lender. Accordingly, Dr. Jacinto soon told John that despite the fact that the School Bus Companies had returned the money, they needed to go back to the lender and "make it right," because she was "afraid of the [confession of judgment]," *i.e.*, the risk that the loan shark could file the instrument without basis, causing substantial harm to the School Bus Companies even if done wrongfully. John, too, was afraid.

Years later, but too late for John, the "hard money lenders" faced significant law enforcement scrutiny as a result of these unfair and illegal tactics. The Federal Trade Commission, the New Jersey Attorney General, and the New York Attorney General all have brought enforcement actions against loan sharks that funded the School Bus Companies. PSR ¶ 70. These law enforcement efforts apparently included a criminal investigation into the merchant cash industry, led by federal prosecutors in New York. Those efforts were stymied in early 2021, when President Trump commuted the sentence of a key hard money lender.[11]

Nearly half of the lenders that the School Bus Companies used (or their affiliates) subsequently have been sued by these enforcement authorities for having engaged in usurious lending and other unlawful practices. These enforcement actions led to enormous settlements, with Yellowstone recently agreeing to vacate $1 billion worth of judgments that it had obtained

---

[11] *See* "A Troubling Trump Pardon, and a Link to the Kushners," *supra* n.10.

through its illegally usurious loans.  PSR ¶ 72.  In connection with these enforcement actions, governmental authorities expressly have recognized John's School Bus Companies as victims of the loan sharks.  The New York Attorney General named the School Bus Companies as victims in its enforcement actions against Yellowstone and Richmond Capital Group LLC.  PSR ¶ 21; *People v. Richmond Capital Group LLC et al*, Index No. 451368/2020, NYSCEF Doc. No. 783 at 1121-22, 1494-95 (N.Y. Sup. Ct. Aug. 28, 2023).  The New York Attorney General and the FTC have both notified the School Bus Companies that they are eligible for relief from those offices' respective settlements with Yellowstone, with the FTC expressly telling the School Bus Companies that they are eligible "because Yellowstone charged your account more than you owed."  *See* Ex. 27 (New York notice); Ex. 28 (FTC notice).[12]

At the time, however, the notion that the "hard money lenders" would be subject to regulatory action was inconceivable.  John felt helpless in dealing with the loan sharks, and the Bus Company's finances grew ever more challenging.

## III.     THE OFFENSE CONDUCT

### a.  The School Bus Companies' Dire Financial Situation

By the fall of 2017, the School Bus Companies were in serious trouble due to the combined effects of abuse by the loan sharks and the uncompensated services it was forced to provide to the WFSD.  As a result of the contractual disputes with the WFSD, the School Bus Companies lost millions of dollars under the contract.  *Id.*  In just the first year, they received about $2.2 million less than they expected, with the losses mounting as the contract entered its second year.

---

[12]  Little likelihood exists "that the Bus Companies will receive more than a nominal sum [from the NYAG settlement], as 20,000 businesses were victimized by [Yellowstone]."  PSR ¶ 72.

John sought out additional work to make up for these losses, obtaining contracts in and around Orange County.  *Id.*  Although these contracts proved profitable for the School Bus Companies (and they continue to serve some of the districts today), they likewise required additional startup costs, which further strained the School Bus Companies' finances.  *Id.*  In response, the School Bus Companies took out increasingly onerous hard money loans throughout the summer and fall of 2017.  *Id.*

### b.  The School Bus Companies Begin Writing Intracompany Checks

The School Bus Companies first opened accounts at Bridgehampton National Bank ("BNB") in March 2017.  In May 2017, shortly after winning the Orange County contracts, the School Bus Companies opened several accounts at Wallkill Valley Federal Savings & Loan ("Wallkill"), so that employees in upstate New York could cash their payroll checks more easily. Both banks offered the School Bus Companies expedited check-clearing privileges, which gave the School Bus Companies near-immediate credit for deposited checks before the underlying funds were received from the drawing bank.  The School Bus Companies initially sought out these expedited check-clearing privileges as a legitimate way of easing cash flow issues.[13]

In the fall of 2017, however, Dr. Jacinto started writing checks from the School Bus Companies' accounts at Wallkill and depositing them into accounts at BNB.  PSR Add. ¶ 8. BNB gave the School Bus Companies immediate credit despite the fact that the Wallkill accounts did not have funds to cover the check.  Initially, these checks were used to cover short-term shortfalls, and only went in one direction (from Wallkill to BNB).  John understood that Dr.

---

[13] Most of the Bus Companies' school district customers paid them by check.  Because the customers typically were billed on a monthly basis, these checks usually had a face value of six figures or more.  Being able to receive credit for these checks immediately, rather than waiting several days to access the needed funds, helped the Bus Companies meet their regular and substantial payroll obligations (among other expenses).

Jacinto was writing these checks (or directing other employees to do so) and he sometimes wrote and deposited them himself when Dr. Jacinto asked him to do so. John was aware the School Bus Companies often had insufficient funds to cover these checks but anticipated (and at times naively hoped) the overdraft would be cured through the receipt of legitimate checks from school districts.

In November 2017, as the School Bus Companies' finances continued to worsen, the checks started flowing in both directions. By January 2018, the School Bus Companies were relying on a daily flow of checks drawn on accounts with insufficient funds to pay necessary expenses including payroll, equipment costs, and repaying the School Bus Companies' numerous loan sharks. On a daily basis, Dr. Jacinto calculated the transactions necessary to maintain the "float" between Wallkill and BNB accounts, then prepared lists of checks to be issued and deposited. John knew of these instructions and the amounts being deposited. These instructions contained the specific amounts that needed to be deposited; which accounts the checks should be drawn on; into which accounts they should be deposited; and (on occasion) a specific time when the checks should be deposited. Dr. Jacinto gave these instructions to employees in the accounting department, copying John. If an intercompany check had not been deposited by a certain time, Dr. Jacinto would follow up with the employee directly to remind them to deposit the check or would ask John to follow up. Occasionally, when an accounting employee was unavailable to effectuate Dr. Jacinto's instructions, John would write and deposit the checks himself.

### c. The School Bus Companies Continue to Rely On These Checks as Their Financial Position Deteriorates

John understood that the School Bus Companies' continued operation depended on wrongfully using intercompany checks to obtain funds. His actions arose from a misguided

effort to save the School Bus Companies and "make sure he did the right thing for his employees." PSR ¶ 48.

Between the fall of 2017 and the summer of 2018, John repeatedly tried to stabilize the School Bus Companies' finances through legitimate means. Using his own contacts, he arranged for a standard, non-usurious $2 million loan from one of the School Bus Companies' equipment lenders, leveraging the last remaining equity that the School Bus Companies held in their buses. He also sought out potential outside investors, receiving generous promises but no firm commitments.[14] Meanwhile, he repeatedly sought to negotiate with the WFSD to obtain the money he believed the School Bus Companies were owed. All the while, John worked double-digit hours each day to ensure that the School Bus Companies continued to serve the many school districts they handled in New York and New Jersey, spending many nights away from home to manage the new contracts in Orange County. None of these attempts at outside financing righted the ship, despite John's significant efforts. With John's approval and participation, Dr. Jacinto continued to orchestrate an increasingly elaborate flow of checks between Wallkill and BNB. PSR Add. ¶¶ 9-11.

During this time, the School Bus Companies' daily cash flow situation became ever more dire as a result of the hard money lenders, who continued to debit from the School Bus Companies' accounts on a daily or weekly basis. Based on a review of the operative agreements and the School Bus Companies' bank statements, counsel estimates that by August 2018, the School Bus Companies were paying approximately $125,000 a day to the hard money lenders.

---

[14] Unfortunately, in his efforts to obtain outside investment, John was further victimized by people who preyed on his desperation and the Bus Companies' dire financial situation. After one contact promised John that he could arrange $46 million in financing, John paid him a nonrefundable "consulting" fee of $75,000, only for the deal to fall through.

This daily debt load was exacerbated by the hard money lenders' abuse of their authority over the School Bus Companies' bank accounts. Through Freedom of Information Law requests to the New York Attorney General, counsel has been able to identify concrete examples of this abuse. In May 2018, East End had taken out a hard money loan from Yellowstone Capital, permitting Yellowstone to make daily withdrawals of $14,990. In July 2018, however, Yellowstone doubled its daily withdrawals to $29,997. Internal Yellowstone emails show that one employee raised concerns about this apparent shift, stating "Payment should be 14,997 a day, not 29,997". In response, Steve Davis—the self-described "Director of Underwriting" at Yellowstone[15]—stated "No chance… merchant is about to go bad".[16] In other words, with full knowledge that the School Bus Companies were "about to go bust," Yellowstone unilaterally *doubled* the amount it was withdrawing from their accounts. Ultimately, Yellowstone collected approximately $525,000 more than it was entitled to collect pursuant to the original payment schedule before the School Bus Companies filed for bankruptcy.

In the late summer of 2018, and with the assistance of the School Bus Companies' legal counsel, John made a final attempt to collect the money that he believed the School Bus Companies were owed by the WFSD. PSR ¶ 21. In response, the WFSD cancelled the School Bus Companies' contract and sought a new vendor for the 2018-19 school year. *Id.* At that point, John recognized that there was no chance that WFSD would pay the School Bus

---

[15] *See* Deposition of Steve Davis, *People v. Yellowstone Capital LLC et al* Index No. 450750/2024, NYSCEF Doc. No. 11 at 57:21-58:15 (N.Y. Sup. Ct. Mar. 5, 2024).

[16] A copy of the email chain is attached as Exhibit 29 to this memorandum. The day after Mr. Davis sent this email, he reportedly called another merchant who had borrowed from a Yellowstone entity and was unable to make payments. *See* Affidavit of Jerry W. Bush, Jr., *People v. Yellowstone Capital LLC et al v.* Index No. 450750/2024, NYSCEF Doc. No. 32 ¶ 59. According to the merchant, Mr. Davis "said that the only way I was going to get out of paying the debt… was if I won the lottery or if I was dead, because [Mr. Davis] could not collect money from a dead body." The merchant then tried to overdose on oxycodone. *Id.* ¶ 61.

Companies the amount he believed was due, leaving the School Bus Companies with an insurmountable deficit. *Id.* Shortly thereafter, John put the School Bus Companies into bankruptcy and subsequently fired Dr. Jacinto. Because John was not protected by the corporate bankruptcy filing, the loan sharks swiftly filed the confessions of judgment that John had personally signed, subjecting John to millions of dollars in personal liability. To this day, John owes millions of dollars to these hard money lenders, and for the foreseeable future, he will live under the cloud of those judgments. PSR ¶ 69.

## IV.    JOHN REBUILDS THE SCHOOL BUS COMPANIES

After the bankruptcy filing, the most likely outcome for the School Bus Companies was failure. The challenges of retaining workers, refinancing substantial vehicle debt, and assuaging concerns of school districts and parents have caused many other private school bus companies (including John's prior business, PSR ¶¶ 66, 79) to dissolve after filing for bankruptcy.[17] Compounding these challenges, large private equity firms have purchased many school bus companies in recent years, seeking to consolidate and build national businesses to outcompete

---

[17] *See, e.g.*, "Atlantic Express Shutting its Doors After Failed Union Negotiations," SCHOOL TRANSPORTATION NEWS, Dec. 6, 2013, available at https://stnonline.com/news/atlantic-express-shutting-its-doors-after-failed-union-negotiations/ ("A month after filing for Chapter 11 bankruptcy protection, 40-year-old school bus contractor Atlantic Express is ceasing operations by the end of the year."); "Baumann Bus Company goes out of business due to coronavirus," NEWS12 LONG ISLAND, April 29, 2020, available at https://longisland.news12.com/baumann-bus-company-goes-out-of-business-due-to-coronavirus-42069569; "New York City School-Bus Operator Files for Bankruptcy," WALL STREET JOURNAL, Jul. 13, 2011, available at https://www.wsj.com/articles/BL-BANKB-17450.

smaller operators.[18]  Given industry headwinds, however, even much larger school bus operators have suffered and seen declines in operations and margins.[19]

Improbably, the School Bus Companies persevered through industry headwinds, with John relying on new accounting help and legal counsel to navigate a protracted bankruptcy proceeding that lasted over four years.  Today, the two primary operating companies—Orange County Transit LLC ("Orange County Transit"), which serves communities in New York, and Montauk Transit LLC, which serves communities in New Jersey—are successful, stable businesses upon which many employees, school districts, and students depend.  Together, they employ approximately 750 workers, serve over twenty school districts and transport 33,000 students on a daily basis.  This remarkable outcome directly resulted from John's extraordinary efforts over the past seven years to rebuild the School Bus Companies.

   a.  **John's Decades of Experience Uniquely Qualify Him to Handle the Distinct Challenges of the School Bus Transportation Business**

Providing transportation services for students is a complicated and difficult job. According to John's uncle, who worked as a teacher and school administrator in Long Island for decades, there are "extraordinary complexities of running a school transportation business in

---

[18] Pryor Cashman LLP, "WE Transport Acquired by Beacon Mobility, an Audax Private Equity Portfolio Company," Jul. 12, 2021, available at https://www.pryorcashman.com/news/we-transport-acquired-by-beacon-mobility-an-audax-private-equity-portfolio-company; "EQT Infrastructure to acquire First Student and First Transit, the market leading providers of essential North American transportation services, for USD 4.6bn," PRNEWSWIRE, Apr. 23, 2021, available at https://www.prnewswire.com/news-releases/eqt-infrastructure-to-acquire-first-student-and-first-transit-the-market-leading-providers-of-essential-north-american-transportation-services-for-usd-4-6bn-301275719.html.

[19] *See, e.g.*, "UK's Mobico shares plunge as it sells US school bus business for $608 million," REUTERS, Apr. 25, 2025, available at https://www.reuters.com/business/autos-transportation/uks-mobico-sell-north-america-school-bus-unit-up-608-million-2025-04-25/ (transportation company sold its "U.S. school bus business for... less than expected," with the company commenting that "[t]he U.S. school bus operations had become too costly to run because of rising wages and potential tariff costs").

New York." Ex. 10, Michael Mensch Letter at 1. John's personal qualities and his years of experience in the school bus transportation business prepared him to deal with these "extraordinary complexities," allowing him to rebuild the School Bus Companies from the ground up.

### i. Specialized Routes Require a Leader Like John

In addition to typical "big bus" routes that serve students who do not require special attention, school bus companies must transport students with disabilities, as well as students who have become unhoused and need to be transported from temporary housing to the district they previously had attended. These routes require additional employees, such as specially trained monitors; specialized vehicles, such as wheelchair vans; and even personalized routes, depending on the level of care needed by the student and/or the distance between their temporary residence and their home district.

Nearly half of the routes that the School Bus Companies service in New York are for special education students. ████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████ John strives to ensure that the Bus Companies provide consistent service, because he knows that even one late or missed bus may be hugely disruptive for these special needs children. As one school district employee writes, John has "a sincere commitment to accommodating students with special needs." Ex. 12, Kristen Dainty

Letter at 1.  He has been "particularly helpful in arranging transportation for children requiring accessible vans, as well as ensuring that trained monitors were available to supervise these students during their transit."  *Id.*  Since 2020, the School Bus Companies also have provided transportation services to Nassau Suffolk Services for Autism, a local non-profit that provides education and training programs for children and adults on the autism spectrum.  Nicole Weidenbaum, NSSA's executive director, reports that "John and his team have delivered consistent, safe, and reliable transportation for our adult program serving individuals on the autism spectrum," and that John's "commitment to our community has made a profound difference."  Ex. 13, NSSA Letter at 1.

Moreover, a significant number of students served by the School Bus Companies lack permanent housing.  John has noticed that the number of unhoused students is rising, as the economy suffers and housing costs grow.  The School Bus Companies' contract with Ulster County, New York is entirely devoted to serving unhoused children in kindergarten and pre-K programs—perhaps the most vulnerable students of all.  Through the Ulster County contract, the School Bus Companies also assist in transporting older children in foster care to and from schools.  In other districts, the School Bus Companies provide transportation to older students who have lost their homes, sometimes arranging trips of fifty miles or more.  In recent years, the School Bus Companies have transported students from New York City to Suffolk County and from the Albany area to Orange County.  Servicing these contracts requires significant planning and coordination.  Given the precarious and contingent nature of temporary housing, the School Bus Companies may need to frequently adjust these routes, which sometimes can change multiple times a week.  When the student is unhoused as a result of domestic abuse or other aggravating circumstances, their temporary housing location may be kept in strict confidence,

with the School Bus Companies only receiving dispatch information from the local health department. John takes on this mission with care and seriousness, working hard to ensure that every student gets the education they deserve.

### ii. John Treats His Clients and Employees with Care and Respect

More generally, the school transportation business requires recognizing the different interests of employees, school districts, and students. John's decades of experience allow him adroitly to manage any disputes that may arise. As one school district employee explains, John assists with "daily dispatching, conflict resolution with students, families, school staff and/or bus drivers, last minute needs and adjustments as well as any additional transportation services that arise." Ex. 12, Kristen Dainty Letter at 1. John is always "accessible if something is needed," such that his school district partners are "easily able to address any concerns or issues that may arise." Ex. 14, Brian Devincenzi Letter at 1; *see also* Ex. 12, Kristen Dainty Letter at 1 (recognizing John's "professionalism" and "courtesy").

John brings the same courtesy, professionalism, and respect to his own workforce, creating an atmosphere of trust and mutual support. Ex. 11, Joseph Cervone Letter at 1 ("I learned from John how important a positive attitude and work environment are to the success of a business, and his people skills are exceptional as he realized how important his workforce is to his success."); Ex. 21, Jim Andruss Letter at 2 ("[John's] personality has allowed him to manage and earn respect from the complete company hierarchy of employees[.]") Denise McGarty, who has worked for the School Bus Companies for ten years, writes that she has "seen firsthand how [John] has shown much care and compassion for all his employees," noting that John has helped out with home repairs, let employees use company vehicles when their cars break down, and offered advice on other personal problems that employees may face, Ex. 15, Denise McGarty

Letter at 1-2. For Ms. McGarty, "it is very refreshing for the employees to know they're not just a number in the workforce." *Id.* at 2.

Other employees of the School Bus Companies echo Ms. McGarty's sentiments. Teresa Pecorello-Logan, a bus driver and monitor who has worked for the School Bus Companies for over a decade, writes that John always "listens when I have a question or concern about the route or students I transport" and that he is always "easy going, understanding, kind, caring, and helpful." Ex. 17, Teresa Pecorello-Logan Letter at 1. Sergo Jovin, who has worked as a bus driver for six years, writes that he has "witnessed [John's] dedication to helping people and others through difficult times in their life" and that John's kindness has earned him "widespread respect and appreciation from my co-workers as well." Ex. 18, Sergo Jovin Letter at 1. Another employee, Marjorie Collier, writes that John always "show[s] appreciation to his employees with thank you cards and office meals" and "ensures the safety of his employees with huddles, reminders, and kind words." Ex. 16, Marjorie Collier Letter at 1. She describes him as "truly a leader to his team, listening attentively and finding solutions for team discrepancies." *Id.* ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

### iii. Through his Hands-On Approach, John Solves Problems and Maintains Operations

Finally, the unpredictable nature of the school bus business means that mechanical and logistical problems arise on a daily basis. As Ms. McGarty explains, John "does not just sit behind a desk while upper management runs the show:' instead, he "gets down in the trenches from the top to the bottom, knowing and even doing the job(s) of every aspect of the business to keep it running." Ex. 15, Denise McGarty Letter at 1. Ms. McGarty has seen John "emptying

the trash, picking up litter in the yard, cleaning the office, moving or transporting buses." *Id.*

Kelsey Mensch, John's daughter, writes that she has learned important lessons from John's work

ethic and humble willingness to take on whatever job needs doing. Ex. 3, Kelsey Mensch Letter

at 1. ("[N]othing has ever been beneath my dad, regardless of his title. If a bus needed to be

driven, a truck route needed to be filled, or a gas station needed an attendant for the day, he

would hop in to fill any gap."). Indeed, John has even cleaned the bathrooms himself when

necessary. *See* Ex. 9, Karen Coady Letter at 1 ("At one point, [John] told me how short staffing

left him no choice but to step in himself—even to the point of cleaning the company

bathrooms.")

> **b. In The Face of Devastating Adversity, John Succeeded Where Others Failed**

John's efforts to rebuild the School Bus Companies are all the more impressive because

of the difficult challenges presented by the bankruptcy filing, the COVID-19 pandemic, and a

nationwide bus driver shortage. As the School Bus Companies' legitimate lenders and school

district partners have recognized, the School Bus Companies likely cannot survive if John is not

available to operate them.

*First*, the School Bus Companies' bankruptcy proved particularly difficult because of

continued interference by the loan sharks. They obtained personal judgments against John that

were unaffected by the School Bus Companies' bankruptcy filing. PSR ¶ 70. "[H]ard money

lenders pursued those judgments, which threatened the [School] [B]us [C]ompanies' ability and

demonstrated that the defendant's continued ownership would imperil the [School] [B]us

[C]ompanies once they emerged from bankruptcy." *Id.* The biggest creditors, however,

recognized that the School Bus Companies could not survive without John's "experience and

strong relationships in the school bus industry." *Id.* The logical solution to this dilemma was for

Jennifer Thomas to purchase the School Bus Companies with John continuing to serve in an executive role. *Id.* The creditors agreed to this plan of reorganization, which was approved by the Bankruptcy Court without objection by the United States Trustee or creditors. *Id.* ¶ 71. Thus, because of John's hard-earned reputation and years of experience, the School Bus Companies were able to reorganize in a manner that allowed them to serve their school districts and students notwithstanding the significant judgments that the criminally usurious hard money lenders had against John personally.

*Second*, John has steered the School Bus Companies through the COVID-19 pandemic and its continuing aftermath. As the New York Times reported in 2020, privately owned school bus companies "fac[ed] an unparalleled threat to their survival" due to the cessation of in-person learning during the COVID-19 pandemic.[20] John recalls that the School Bus Companies "had to figure out how to pay the employees, equipment payments, rental payments, insurance, and so much more" despite not running their routes. Ex. 1, John Mensch Letter at 3. John used his strong relationship with local districts to improvise and find services where the School Bus Companies could pitch in and continue to earn revenues. *Id.* at 3-4. Throughout the pandemic, the School Bus Companies delivered meals to students and their families, along with school supplies and materials for remote learning. *Id.* By maintaining these relationships, John ensured that the School Bus Companies were in a position to continue to serve these districts when students returned to school. *Id.* at 4.

---

[20] "'End of the Line': School Bus Industry in Crisis Because of the Coronavirus," N.Y. TIMES, Aug. 28, 2020, available at https://www.nytimes.com/2020/08/28/us/coronavirus-school-buses.html.

As COVID-19 pandemic began to abate, school bus transportation companies faced a nationwide bus driver shortage, which continues to this day.[21]  Again, John met this challenge head on, stepping up when he was needed to drive buses and working hard to hire and maintain staff when other providers could not do so.  John's colleague Denise McGarty recalls that the nationwide bus driver shortage was at its peak when the School Bus Companies began servicing routes in Kiryas Joel, New York.  Ex. 15, Denise McGarty Letter at 2.  Although other providers might have reduced service and blamed the shortage, "John would drive a route every day to ensure service was never compromised." *Id.*  While he was driving the bus, John would dispatch other routes "from the bus he was driving," therefore "[e]nsuring the other drivers for [Kiryas Joel] knew where they were going" and "[m]aking sure all students were picked up in a timely manner." *Id.*  After he finished driving, John would come back to the office and "personally call and take calls from parents and answer any questions they may have regarding their child's new bus route." *Id.*

John's school district partners report that John and the School Bus Companies "have continued to work diligently to hire and maintain staff to keep our service reliable for all our runs." Ex. 14, Brian Devincenzi Letter at 1.  Mr. Devincenzi, the Assistant Superintendent for Support Services of the Wallkill Central School District, further explains that John's diligent work has paid off when others could not deliver: "While other districts have struggled to

---

[21] "The school bus driver shortage has improved slightly but continues to stress K–12 public education," ECON. POLICY INSTITUTE, Nov. 3, 2025, available at https://www.epi.org/blog/the-school-bus-driver-shortage-has-improved-slightly-but-continues-to-stress-k-12-public-education/ ("School bus driver employment… is still 9.5% lower than in 2019."); National School Transportation Association, Comment Letter re Docket No. FMCSA-2022-0148-0065 (Jul. 1, 2024), available at https://yellowbuses.org/Portals/0/xBlog/uploads/2025/8/8/toFMCSAReCommentfromNationalSchoolTransportation2024-07-01.pdf. ("[T]he nationwide driver shortage continues to plague the student transportation system, and operators around the country still feel its impact.")

maintain staff and have reliable service, John and Orange County Transit have not, even after COVID." *Id.*

As a result of John's efforts and leadership, the School Bus Companies have been able to step in at short notice to provide emergency help to school districts when other transportation operators could not deliver, or when the school district could not provide those services itself. Such challenges have become more frequent, as private equity-owned firms that operate nationally may struggle to manage problems at the regional level. In one notable example, Orange County Transit stepped in when a competitor had difficulty staffing the Sachem School District's special education routes, causing significant disruption to the district's most vulnerable students.[22] John's former colleague Joseph Cervone, who worked at the Sachem School District during this crisis, recalls that "hundreds of special needs children" were left without service due to a "driver shortage": in total, "twenty-two routes and 300 special needs children had no transportation for the first week of school." Ex. 11, Joseph Cervone Letter at 1. One parent, whose son relied on these buses to receive specialized instruction in Bellport, told Newsday that she could not transport her son herself ("It's a far-drive for me – it's two hours round trip and I work full time") and his son would accordingly "miss[] his whole first week of school."[23] Mr. Cervone, who had seen John successfully step in when other districts had similar emergencies, quickly arranged a meeting. Within days, "John was able to provide the services to Sachem." Ex. 11, Joseph Cervone Letter at 1. The parents of these children were so grateful for Orange

---

[22] *See, e.g.*, "Sachem SD brings in additional bus company to help with transportation issues," NEWS12 LONG ISLAND, Sept. 14, 2023, available at https://longisland.news12.com/sachem-sd-brings-in-additional-bus-company-to-help-with-transportation-issues.

[23] "School bus problems for Sachem, other special education students," NEWSDAY, Sep. 8, 2023, available at https://www.newsday.com/long-island/education/busing-issues-first-week-lxapjc7p.

County Transit's intervention that they actually applauded upon hearing the news that Orange County Transit's contract had been extended. As one Board of education member remarked at the meeting, a round of applause is "[n]ot something you see every day".[24]

Other districts and institutions also have relied on John and the School Bus Companies to assist when other operators could not.[25] Ms. Weidenbaum of NSSA reports that "no other provider was willing or able to meet the unique needs of our clients," but John "stepped forward without hesitation." Ex. 13, NSSA Letter at 1. She writes on behalf of NSSA that the organization is "deeply grateful to John for his partnership and for making this vital service possible when we needed it most," allowing NSSA "to maintain continuity and dignity in the lives of the individuals we serve." *Id.*

## V. THIS PROSECUTION'S IMPACT ON JOHN, HIS FAMILY, AND THE SCHOOL BUS COMPANIES

John sincerely and deeply regrets his actions. His genuine remorse and contrition are apparent in his letter to the Court, his statements to the Probation Office, and the letters submitted by his family and friends, who recognize how deeply John regrets his actions. Ex. 1, John Mensch Letter at 1, 4 ("Words cannot express how truly sorry I am for my actions that have brought me here to you today… I deeply regret going down this path and not stopping sooner and I realize as the owner of the company it is my responsibility to take the burden of these actions."); PSR ¶ 21 ("[John] understands that he cannot take back what he did; he recognizes how wrong it was to defraud the banks and deeply regrets how his desperate and reckless actions

---

[24] Sachem Schools, "October 25, 2023 Board of Education Meeting," available at https://www.youtube.com/watch?v=2XC0PAWPmag&t=2083s.

[25] "Kingston school board hires Orange County Transit to take over 9 bus routes," DAILY FREEMAN, Mar. 14, 2024, available at https://www.dailyfreeman.com/2024/03/14/kingston-school-board-hires-orange-county-transit-to-take-over-9-bus-routes/.

caused millions of dollars in losses."); Ex. 10, Michael Mensch Letter at 2 ("My frequent conversations with [John] as his case has evolved lead me to believe he understands the depth of his situation and wants, with all his strength and commitment, to take responsibility and work towards making things right.")

John understands, however, that his words of regret are not sufficient. As a result, even before sentencing, he made substantial restitution to BNB and Wallkill and committed to repay both banks for all of the losses they suffered. In February 2025, John and Orange County Transit agreed to pay Wallkill and its insurer, Zurich American Insurance Company ("Zurich"), $775,000 over a period of five years.[26] *See* Ex. 30 (Wallkill Agreement); PSR Add. ¶ 13. To date, Orange County Transit already has made payments of $275,000 under the agreement and will continue to make monthly payments of $12,500 until the full $775,000 is paid. John expects that the payments under this agreement will be funded by Orange County Transit's ongoing operations.

In September 2025, John entered into an agreement to pay $8,200,000 to BNB's successor, Dime Community Bank, over a period of twelve years.[27] *See* Ex. 31 (Dime Agreement); PSR Add. ¶ 13. John arranged for the initial payment of $1,500,000 on September 25, 2025, which was funded largely with funds from Orange County Transit. BNB has since received an additional $70,000, and John is responsible for monthly payments in the amount of $35,000 through October 2030 and $70,714.29 from November 2030 through July 2037. As with the Wallkill agreement, John expects that the payments to BNB will be funded by the

---

[26] Wallkill and Zurich informed John's counsel that, after a $675,000 insurance payment from Zurich, Wallkill's out-of-pocket loss was $100,000.

[27] For simplicity, we refer to "BNB" throughout to refer to both BNB and its corporate successor. In connection with the discussions leading up to the agreement, BNB's counsel informed John's counsel that that BNB had lost $8.2 million as a result of the conduct underlying John's guilty plea. We understand that the balance of the loss figure in PSR ¶ 13 was paid by insurance.

ongoing operations of Orange County Transit.  Although John understands that he cannot take

back what he did, he hopes that these efforts to repay the banks can begin to remedy the past

wrongs which he so deeply and sincerely regrets.

Furthermore, John recognizes that his reckless decisions not only have placed his own

liberty at jeopardy, but also significantly impact others who depend on him.  John knows how

much all his children and stepchildren— ███████████████████████ —

depend on his steady support.  Similarly, both he and Jennifer fear that his incarceration would

cause the School Bus Companies to collapse, with devastating consequences for hundreds of

employees and thousands of students and their families.  Most of the School Bus Companies'

approximately 750 employees drive or work on buses, or perform similar blue-collar roles (like

mechanics).  No guarantee exists that they would find similar-paying jobs elsewhere should the

School Bus Companies fail, particularly with the unemployment rate at a four-year high.

Similarly, as large private equity firms have purchased many private school bus companies,

school districts have found difficulty in finding vendors who can service all of their routes,

including the most challenging and specialized routes that John and the School Bus Companies

excel in handling.  The School Bus Companies fulfill a vital and important role in the lives of

these many stakeholders.  John's daily involvement is the key to keeping the School Bus

Companies solvent and successful.

## **DISCUSSION**

### I.      **RELEVANT LAW**

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 245

(2005), the Sentencing Guidelines are genuinely "guidelines—that is, they are truly advisory."

*United States v. Maxwell*, 118 F.4th 256, 270 (2d Cir. 2024).  District courts cannot "presume that

the Guidelines range is reasonable," nor are "extraordinary circumstances" required to "justify a

sentence outside the Guidelines range." *Gall v. United States*, 552 U.S. 38, 47-50 (2007).

Instead, after "correctly calculating the applicable Guidelines range," the Court must "consider all of the § 3553(a) factors" and "make an individualized assessment based on the facts presented." *Id.* at 49-50. In considering these factors, the Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). Although mercy is "seldom included on the list of traditional rationales for sentencing," the principle of mercy is embodied in this statutory provision, which requires "that the lowest possible penalty consistent with the goals of sentencing be imposed." *United States v. Blarek*, 7 F. Supp. 2d 192, 210 (E.D.N.Y. 1998).

Counsel respectfully submits that the confluence of these factors support a sentence of probation and an order that John continue to make restitution to the banks.

## II.     THE GUIDELINES CALCULATION

John pled guilty to one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 371. The applicable Guideline for the offense is U.S.S.G. § 2B1.1. The Probation Office has calculated John's adjusted offense level as 25, which reflects a base offense level of 6; an 18-level enhancement based on the loss amount, pursuant to U.S.S.G. § 2B1.1(b)(1)(J); a four-level leadership role enhancement, pursuant to U.S.S.G. § 3B1.1; and a three-level decrease based on John's acceptance of responsibility, pursuant to U.S.S.G § 3E1.1. PSR ¶¶ 23-32.

John concurs with these calculations, with the exception of the four-level leadership role enhancement, which neither the government nor defense counsel believes should apply here.[28] John has fully accepted responsibility for his conduct and stipulated to the application of a two-level role enhancement in his plea agreement. A four-level role enhancement, however, is unwarranted, because the offense did not involve five or more participants. *See* U.S.S.G. § 3B1.1, Application Note 1 (defining "participant" as "a person who is criminally responsible for the commission of the offense").

For purposes of calculating the Guidelines, counsel does not disagree with the government that four individuals were culpable participants in writing and depositing intracompany checks. Although a fifth employee of the School Bus Companies, a lower-level employee who worked for in Orange County, New York (the "Upstate Employee"), deposited BNB checks in Wallkill accounts, she was not privy to the simultaneous deposit of Wallkill checks in BNB accounts. Because the Upstate Employee did not understand the circular and illegal nature of the transactions, she does not qualify as a "participant" for purposes of section 3B1.1. *United States v. Leonard*, 37 F.3d 32, 38 (2d Cir. 1994) ("unwitting" grocery store workers who "performed activities that advanced… [a] cash-skimming scheme" were not "participants" because they lacked knowledge of the criminal nature of the scheme); PSR Add. ¶¶ 16, 26.[29]

---

[28] Specifically, the government has represented that it too does not believe a four-level enhancement is appropriate here and will not be arguing for the application of that enhancement.

[29] The PSR Addendum issued by the Probation Department on November 25, 2025 asserts, without any support or explanation, that six individuals were involved in the offense conduct, and that excluding the Upstate Employee leaves five culpable participants. The government has expressly disavowed that it has proof sufficient to support this conclusion. Following the filing of the PSR Addendum, the government informed defense counsel and the Probation Office that it does not contend (and would not be able to establish) that five or more culpable participants were involved in the offense conduct. Consequently, as a matter of law, the four-level enhancement

Because the offense involved only four participants, no basis exists for a four-level enhancement, and counsel submits that the correct adjusted offense level is 23. Because John is in Criminal History Category I, the Guidelines range is 46 to 57 months. As described further below, the extraordinary circumstances of John's case justify a substantial downward variance.

## III. JOHN'S HISTORY AND CHARACTERISTICS COUNSEL IN FAVOR OF A NON-CUSTODIAL SENTENCE

As set forth below, two aspects of John's "history and characteristics" support a non-custodial sentence. ███████████████████████████████████████████████████████

█████████████████████████████████████ *Second*, a variance also is warranted to account for the essential role that John performs for the School Bus Companies and the approximately 750 employees, dozens of school districts, and tens of thousands of students who depend on him. 18 U.S.C. § 3553(a)(1); *United States v. Milikowsky*, 65 F.3d 4, 7-8 (2d Cir. 1995).

████████████████████████████████████████████████████

As the letters to the Court make clear, John is a loving father to all of his children and stepchildren, and his absence from their lives would be challenging.[30] ████████████████

_____

cannot be sustained. *See United States v. Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003) ("At sentencing, disputed factual allegations must be proven by the government by a preponderance of the evidence[.]")

[30] Ex. 3, Kelsey Mensch Letter at 1 ("As his daughter, my dad has also provided me with unconditional support, specifically when I've doubted myself or struggled… He lifts me up when I feel discouraged and empowers me to know my worth and trust my gut."); Ex. 7, Jennifer Mensch Letter at 1 ("By providing unwavering support and unconditional love he has developed close relationships with each of his children… In this next phase of their lives, John's support continues to be an essential part of their daily lives. He is always available for them, any hour or day of the week."); Ex. 5, Mitchell Beattie Letter at 1 ("Unlike most stereotypically tenuous father-in-law relationships, John welcomed me from the first day I met him and treated me like his own son….Throughout my life, John has met my own mistakes and uncertainty with unconditional generosity and empathy. He has always treated me as his equal and showed trust in spite of my mistakes."); Ex. 6, Caleigh Thomas Letter at 2 ("John has always been one of the





45

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

### b. Hundreds of Employees and Tens of Thousands of Students Depend on John

As the Second Circuit and numerous courts in this district have recognized, leniency is warranted when the survival of a business and its employees' livelihoods wholly depend on the defendant, because a court should endeavor "to reduce the destructive effects that incarceration of a defendant may have on innocent third parties." *Milikowsky*, 65 F.3d at 7; *see, e.g.*, *United States v. Gorodetsky*, 288 F.R.D. 248, 249-50 (E.D.N.Y 2013); *United States v. Khalid*, 2011 WL 6967993, at *2 (E.D.N.Y. Dec. 13, 2011); *United States v. Romano*, 2008 WL 4427759, at *1 (E.D.N.Y. Sept. 16, 2008). The PSR and the letters submitted to the Court make clear that John is essential to the survival of the School Bus Companies. Incarcerating John puts their survival at risk, with collateral consequences not only for their employees, but for the school districts, students, and parents that depend on this important company that has uniquely adapted to serve the needs of the community.

John has worked in the school bus industry since high school, having learned the business from his father. Through this lifetime of experience, John not only developed an unparalleled understanding of school bus transportation, but earned a reputation as a trusted and dependable partner to school districts. No one other than John has ever run the School Bus Companies. Given that he is the only individual with the "knowledge, skill, experience, and relationships" to run the School Bus Companies, John is essential to their continued success. *Milikowsky*, 65 F.3d at 8.

The letters submitted by John's employees and clients illustrate the essential role that John plays. He is hands-on and oversees the daily operations of the School Bus Companies, managing the daily transportation of tens of thousands of students, the maintenance of the School Bus Companies' many vehicles and equipment, and the School Bus Companies' relationships with their many school district customers. John wears many hats and jumps in to solve problems as they arise. His longtime employee Denise McGarty remains "amazed" by "how much [John] know about his business" and his willingness to "lead[] by example" in taking on whatever tasks need doing. Ex. 15, Denise McGarty Letter at 1 ("If someone called out at the last minute, many times John can be seen driving a school bus route amongst his employees, in any district we service and at all our locations, whether it be a large bus or van."); *see also* Ex. 17, Teresa Pecorello-Logan Letter at 1 ("[John's] work ethic is 'just do your job'. As an employer I have witnessed him drive buses, dispatch, fuel buses and help on breakdowns.")

Furthermore, John has been able to retain workers in the face of a nationwide bus driver shortage because of Orange County Transit's good pay and benefits and, most important, John's care and commitment to his employees. Ex. 11, Joseph Cervone Letter at 1 ("John's ability to lead and recognize how to make a person be the best they can be is impeccable and for that I will be forever grateful... his people skills are exceptional as he realized how important his workforce is to his success."); Ex. 15, Denise McGarty Letter at 1 ("I have seen firsthand how he has shown much care and compassion for all his employees. Listening to them, knowing their individual stories. Realizing there may be a reason an employee is not working to their full capacity or not acting like themselves. Not just looking at them as someone that could be easily replaced.") Phil Vignola, who works as an insurance broker and consulted on arranging a full benefits package for the School Bus Companies' employees, writes that he was impressed by

John's "rare level of empathy and care for his team." Ex. 24, Phil Vignola Letter at 1. ███

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████ As another

employee writes, "I know that if I needed to ask him for assistance he would do so willingly and

without hesitation." Ex. 17, Teresa Pecorello-Logan Letter at 1.

As a result of these extraordinary efforts, approximately 750 workers currently are

employed by the School Bus Companies, most of them in blue-collar roles. PSR ¶¶ 86, 90. John

has given these hard-working people good-paying jobs and opportunities to advance, sometimes

changing their lives in the process. According to former employee Joe Cervone, "if it wasn't for

John Mensch I would not own my home, I would not have provided a college education for my

children, nor have a career with retirement benefits." Ex. 11, Joseph Cervone Letter at 2. Mr.

Cervone recalls many people "who have been able to live good happy lives" through their work

for John. *Id.*

Moreover, John's devotion to providing reliable transportation for students, including his

"sincere commitment to accommodating students with special needs," Ex. 12, Kristen Dainty

Letter at 1, has given the School Bus Companies a reputation as a reliable and trusted operator,

notwithstanding the numerous headwinds facing the private school bus transportation business.

When school districts encounter fiascos with other providers, they call John so that the School

Bus Companies could save the day. Ex. 11, Joseph Cervone Letter at 1.

John continues to serve in this critical role even though he is no longer the owner of the

School Bus Companies. PSR ¶ 62. As Jennifer Thomas explains, "not much has changed,

operationally" since the bankruptcy.  *Id.*  John remains the critical day-to-day manager of their operations: he is "the leader in our business" and "the person the clients call when they have questions about service."  Ex. 2, Jennifer Thomas Letter at 2; *id.* at 3 ("He prepares bids, negotiates contracts with school districts, handles parent/district relations along with being able to drive a school bus, diagnose the buses that need repair along with a multitude of other daily tasks that are needed.")

Ms. Thomas is frank and unguarded in her letter to the Court: "I have never had to operate the business without John by my side and honestly, I am afraid of how a sentence of imprisonment will affect the continued success of the business."  *Id.*  John's absence "is a concept that we have never had to deal with."  *Id.* at 2.  She predicts that if she has to run the company without John, "predatory" competitors will seize the opportunity to take the School Bus Companies' contracts.  *Id.*  Beyond the School Bus Companies' relationship with school district customers, John also is responsible for ensuring the maintenance of the School Bus Companies' fleet and managing their relationship with equipment lenders and insurance companies.  Ms. Thomas further worries that his absence would jeopardize those relationships: "Losing John could debilitate our business, and our ability to pay our employees, and all our financial obligations to various lenders."  *Id.* at 3.  Although Ms. Thomas would no doubt do her best in John's absence, the School Bus Companies would be in uncharted territory, and no guarantee of their survival exists.

As in other cases where a non-custodial sentence has been imposed, the School Bus Companies "demand[] [John's] daily personal involvement to secure the continued success of the business and the continued job security currently provided its many employees."  *United States v. Toback*, 2005 WL 992004, at *5-6 (S.D.N.Y. Apr. 14, 2005) (granting downward departure to

"permit[] Toback to continue providing for the long-term success of Westerly Market and its employees"). Moreover, John's work ethic "is the source of the business's growth and development." *Id.* at *6. John is the "public face" of the company whose "unique talents" and "responsiveness to customers' needs" have allowed the School Bus Companies to maintain school district clients across New York and New Jersey. *United States v. Somerstein*, 20 F. Supp. 2d 454, 461-62 (E.D.N.Y. 1998) (granting downward departure because "incarcerating [Somerstein] will impose a grave hardship on the employees, and with reasonable certainty, will leave them jobless").

For these reasons, John's "history and characteristics" show that he is essential to the School Bus Companies, and a term of incarceration will create a genuine risk that the School Bus Companies will fail, resulting in devastating collateral consequences for hundreds of employees, over twenty school districts, and tens of thousands of students (including many who are homeless or have special needs). *Cf. Gorodetsky*, 288 F.R.D. at 249-50 (noting that sustained operation of the defendants' business, an asbestos removal service, would "protect[] both employees and the public").

## IV. THE ROLE OF THE USURIOUS HARD MONEY LENDERS FURTHER SUPPORTS A NON-CUSTODIAL SENTENCE

In evaluating "nature and circumstances of the offense," we ask the Court to consider the nefarious role that the loan sharks played in exacerbating the circumstances that led to the offense conduct—particularly as their illegal conduct, coercive threats, and direct financial control over the School Bus Companies' bank accounts were not addressed by regulators until years after they played a material role in the School Bus Companies' insolvency. As the PSR already recognizes, the hard money lenders charged John and the School Bus Companies illegally usurious interest rates and subjected John to unrelenting intimidation and threats of

destruction.  PSR ¶¶ 20, 70-72.  Feeling he had no other options, John approved the School Bus Companies' continued use of these predatory lenders, signing personal guarantees for each of the advances the School Bus Companies received.  Despite John's hard work, the continued use of hard money loans throughout the fall of 2017 put the School Bus Companies on the brink of insolvency.

Not viewing bankruptcy as a viable option, and hoping that a resolution of the WFSD contract or another legitimate funding source would infuse much-needed capital into the business, John made the decision he so deeply regrets now and engaged in the offense conduct. As the offense conduct continued, the hard money lenders exacerbated the School Bus Companies' financial distress through their abusive conduct, including deducting excessive fees, charging usurious interest, and even taking money to which they were not entitled.  Indeed, as a condition of these loans, the School Bus Companies had to surrender control over their own bank accounts; the hard money lenders then abused this absolute authority to extract as much money as they could from the School Bus Companies.

Although he knew of and approved the use of these lenders out of desperation, John was nevertheless a victim of their criminal acts.  Indeed, the New York Attorney General and the Federal Trade Commission, in their investigation of the predatory lenders that have led to significant judgments and settlements, have recognized the School Bus Companies as victims. PSR ¶¶ 21, 72; Exs. 27, 28.  Such efforts, however, came too late for John and the School Bus Companies, who already had paid millions of dollars in criminally usurious interest.

John knows that the hard money lenders' unlawful actions do not excuse his own conduct.  Their abuse of John and the School Bus Companies, however, provides critical context for why the offense conduct transpired and should be taken into account in fashioning an

appropriate sentence. Indeed, as many courts, including this Court, have recognized, usurious lending is serious illegal conduct that has devastating consequences for individuals and businesses. Furthermore, the abusive actions of hard money lenders have led to downward variances in analogous cases. In *United States v. Sosna*, No. 20 Cr. 305 (W.D. Pa.), a bank fraud case involving $60 million in losses, the district court considered the fact that hard money lenders had devasted the defendant's business and exacerbated the banks' losses. At sentencing, the district court observed that the lenders were "merchant loan sharks," and told Mr. Sosna, "you were a victim of them, and they pulled you down the rabbit hole[.]" Transcript of Sentencing, *United States v. Sosna*, No. 20 Cr. 305, ECF 84 at 45:7-14 (W.D. Pa. Oct. 6, 2023). This abuse, among other things, caused the district court to apply a substantial downward variance.[31] The hard money lenders' abuse of John and the School Bus Companies, coupled with the other mitigating factors noted above, similarly supports a substantial variance and a non-custodial sentence here.

## V. A NON-CUSTODIAL SENTENCE WILL ENABLE JOHN TO PROVIDE MEANINGFUL RESTITUTION

The "need to provide restitution to any victims of the offense" further supports the imposition of a non-custodial sentence. 18 U.S.C. § 3553(a)(7). Other courts in this district have recognized that a sentence of incarceration typically will frustrate the restitution process. *United States v. Marsh*, 820 F. Supp. 2d 320, 330 (E.D.N.Y. 2011) (imposing below-Guidelines sentences because "the defendants need to begin earning a living as soon as possible in order to pay the victims the restitution due to them"); *United States v. McCarthy*, 2023 WL 3741996, at *4 (E.D.N.Y. May 30, 2023) (imposing non-custodial sentence because the government, to

---

[31] Unlike John, however, Mr. Sosna devised the crime alone, had not made any apparent restitution payments before sentencing, and caused a loss of nearly $60 million.

whom restitution was owed, "would be less likely to recover the restitution it seeks" if defendant was incarcerated).

John has been rendered insolvent as a result of the loan sharks. Nonetheless, he has started making restitution. PSR Add. ¶ 13; Exs. 30, 31. This restitution will continue and, of course, is dependent on the revenues generated by the School Bus Companies. Accordingly, incarceration poses significant risks here because meaningful restitution will depend on the continued success of the School Bus Companies. If not for his success in restoring the School Bus Companies' financial stability, no realistic possibility exists that Wallkill and BNB could be made whole. Because of John's efforts, however, Wallkill and BNB already have received a total of $1,845,000 and are currently receiving combined restitution payments of nearly $50,000 a month, which will increase to payments of more than $70,000 a month after November 2030.

These significant payments, which far outstrip the amount that John could pay through his own salary or assets, depend entirely on John's continued success in operating the School Bus Companies. A sentence of incarceration will likely end that hard-won success, therefore foreclosing any possibility of meaningful restitution.

## VI. A SENTENCE OF INCARCERATION WOULD NOT SERVE THE PURPOSES OF SPECIFIC OR GENERAL DETERRENCE

### a. John Has Little Need for Specific Deterrence and a Low Risk of Recidivism

John's acceptance of responsibility and his actions since the offense conduct demonstrate that a sentence of incarceration is unnecessary either to promote specific deterrence or "protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B)-(C).

As the Probation Office has recognized, John has "clearly" accepted responsibility for the offense. PSR ¶ 30. John has demonstrated his unqualified acceptance of responsibility not simply through his guilty plea, but also by having already made significant restitution payments

to BNB and Wallkill. As courts in this Circuit have recognized, "pre-sentencing restitution to a victim is a powerful display of remorse that a judge may and should take account of in fashioning a sentence." *United States v. McKenzie*, 2023 WL 1861286, at *2 (S.D.N.Y. Feb. 9, 2023); *see, e.g.*, *McCarthy*, 2023 WL 3741996, at *3 (imposing non-custodial sentence based on, *inter alia*, the fact that defendant "already made efforts to comply with this restitution order, paying back $100,000 prior to his sentencing"). John's actions therefore make clear that he is "unlikely" to "engage in further criminal activity." *United States v. Carrasquillo*, 2013 WL 3466538, at *2 (E.D.N.Y. May 21, 2013) (noting defendant's "remorse" and "acceptance of responsibility").

John's record since the offense conduct further demonstrates that incarceration is unnecessary to serve the goal of specific deterrence. The charged scheme ended in September 2018. PSR ¶ 8. In the more than seven years since, John has worked to be a productive member of society. He is devoted to his family and his work, and he deeply regrets that his past behavior now puts both at risk. Moreover, as the PSR recognizes, John has abided by all the conditions of his release since pleading guilty more than a year ago. *Id.* ¶ 3. Under these circumstances, the need for specific deterrence is "very low." *See* Transcript of Sentencing, *United States v. Wälchli*, No. 20 Cr. 497, ECF 116 at 58-59 (S.D.N.Y. Apr. 2, 2024) (imposing sentence of time served, in part because the defendant's good behavior for a decade after the offense conduct proved the need for specific deterrence was "very low").

Finally, any remaining concerns regarding the need for specific deterrence should be quelled by John's strong family and community support. *See United States v. Turner*, 629 F. App'x 66, 68 (2d Cir. 2015) (noting that defendant received below-Guidelines sentence based on, *inter alia*, "wonderful family support"); *United States v. Burnell*, 367 F. Supp. 3d 12, 16

(E.D.N.Y. 2019) (imposing below-Guidelines sentence where, *inter alia*, defendant's family and friends were "aware of his conviction and appear committed to helping him avoid further trouble with the law").

### b. A Non-Custodial Sentence Will Serve the Purposes of General Deterrence

Similarly, a sentence of incarceration is unnecessary to further general deterrence. The National Institute of Justice, a component of the U.S. Department of Justice, has stated that "sending an individual convicted of a crime to prison isn't a very effective way to deter crime."[32] Courts in this district have thus recognized that the purposes of general deterrence may still be served when a non-custodial sentence is imposed. *United States v. Mullings*, 131 F. Supp. 3d 1, 4-5 (E.D.N.Y. 2015) (imposing non-custodial sentence in bank fraud prosecution); *McCarthy*, 2023 WL 3741996, at *3 ("The goals of general deterrence and just punishment are served by this [non-custodial] sentence: the offense has had a ruinous impact on Mr. McCarthy's life, and he is now subject to a very significant financial penalty.") Moreover, as then-Judge Kavanaugh has explained, a non-custodial sentence does not itself undercut general deterrence, as the discretion afforded to sentencing judges means that "the next similarly situated offender… cannot expect the same treatment." *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) ("In light of the discretion afforded to district courts by the Supreme Court's sentencing decisions, only a fool would think that he or she necessarily would receive the same sentence as Gardellini for a similar…offense.")

These lessons apply with exceptional force here. As a result of the offense conduct, John is subject to enormous financial penalties, on top of the millions of dollars in judgments entered against him. He has been publicly shamed; in the Department of Justice's press release

---

[32] *See* National Institute of Justice, "Five Things About Deterrence" (May 2016), available at https://www.ojp.gov/pdffiles1/nij/247350.pdf.

announcing John's guilty plea, law enforcement described John as an "insidious criminal[]."[33] His plea was widely reported in local media, such as News12 Long Island and Newsday,[34] as well as in trade publications.[35]  Moreover, John will suffer significant collateral consequences, including potentially losing "one of the things he loves most about this business"—driving a school bus for children.  Ex. 2, Jennifer Thomas Letter at 3.  School bus transportation workers who come into contact with students must pass background checks in New York and New Jersey. *See* N.Y. Vehicle & Traffic Law Article 19-A; N.J. Admin. Code § 13-20-30.14; PSR Add. ¶ 121. As a result of this requirement, Ms. Thomas believes that John "will no longer be able to drive a school bus with his conviction" and the "daily interaction and satisfaction from doing this is no longer a possibility."  Ex. 2, Jennifer Thomas Letter at 3.

Under these circumstances, the public will understand that John already has suffered, and will continue to suffer, serious consequences as a result of his conduct.  Incarceration would not further this already strong message.

---

[33] "Long Island Businessman Pleads Guilty in Bank Fraud Conspiracy," Oct. 2, 2024, available at https://www.justice.gov/usao-edny/pr/long-island-businessman-pleads-guilty-bank-fraud-conspiracy.

[34] "Medford school bus company's former owner pleads guilty to multimillion-dollar bank fraud scheme," NEWS12 LONG ISLAND, Oct. 3, 2024, available at https://longisland.news12.com/medford-school-bus-companys-former-owner-pleads-guilty-to-multimillion-dollar-bank-fraud-scheme; "Medford bus company owner pleads guilty to fraudulently getting $9 million from banks to keep business going," NEWSDAY, Oct. 2, 2024, available at https://www.newsday.com/long-island/crime/john-mensch-medford-bus-company-check-kiting-scheme-guilty-plea-sjpox6us.

[35] "School Bus Company Owner Brought Down by High-Stakes Fraud Scheme," SCHOOL TRANSPORTATION NEWS, Oct. 22, 2024, available at https://stnonline.com/news/school-bus-company-owner-brought-down-by-high-stakes-fraud-scheme/.

## VII. A SENTENCE OF INCARCERATION WOULD CREATE UNWARRANTED SENTENCING DISPARITIES

The "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), likewise weighs in favor of a downward variance. Counsel has identified that, under the unique circumstances of this case, only one matter involves truly "similar conduct," including an analogous amount of loss, and a defendant with a "similar record[]." In *United States v. Khan*, No. 13 Cr. 268 (E.D.N.Y.), Saquib Khan was charged with bank fraud under circumstances remarkably similar to this case. Judge Dearie imposed a sentence of probation, conditioned on the defendant making full efforts to satisfy the restitution order.

Like John, Mr. Khan was a small business owner under significant financial pressure. Mr. Khan owned a wholesale grocery business in Staten Island that had difficulty obtaining loans through traditional sources. Mr. Khan's businesses—like the School Bus Companies—had been granted same-day clearing privileges on their checking accounts at multiple banks. As the prosecution explained at Mr. Khan's sentencing hearing, Mr. Khan ultimately "began the process of cycling through… checks to get at least short-term advances on money that he could cover either with another check or with the proceeds of his businesses coming in." Transcript of Sentencing, *United States v. Khan*, No. 13 Cr. 268, ECF 37 at 5:10-13 (E.D.N.Y. Nov. 19, 2014). When these financial pressures did not abate, however, Mr. Khan continued to write checks from one business to another in a circular fashion, "hoping that the business would expand and eventually he'd be able to pay these people off." *Id.* at 7:21-22.

All told, the banks at issue in *Khan* lost $4.7 million, resulting in an eighteen-level Guidelines enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(J)—the same eighteen-level enhancement applicable to John. *See* Government's Sentencing Submission, *United States v.*

*Khan*, No. 13 Cr. 268, ECF 33 at 3 (E.D.N.Y. Sep. 4, 2014). Like John, Mr. Khan had no

criminal history and fell in Criminal History Category I. Government's Sentencing Submission,

*United States v. Khan*, No. 13 Cr. 268, ECF 33 at 1, 5. (E.D.N.Y. Sep. 4, 2014). At sentencing,

defense counsel explained that Mr. Khan—like John—had borrowed money from legitimate

sources in order to keep the business afloat, but ultimately used the same-day funds provided to

him by the banks "so that he could pay his suppliers and his employees." *Id.* at 18:7-9.

Moreover, the government acknowledged that Khan, like John, was not a "classic kiter" who

"writes a check for a boat and then drives it away[.]" *Id.* at 7:8-9.

Through its evaluation of the Guidelines, including the same eighteen-level enhancement

applicable to John, the district court in Mr. Khan's case determined that Mr. Khan's adjusted

offense level was 26 (three levels higher than John's), which resulted in a Guidelines range of 63

to 78 months. Transcript of Sentencing, *United States v. Khan*, No. 13 Cr. 268, ECF 37 at 14:12-

18 (E.D.N.Y. Nov. 19, 2014). At sentencing, and based on its consideration of the Section

3553(a) factors, the district court granted a downward variance and sentenced Mr. Khan to

probation. The district court described Mr. Khan's case as "unusual," observing that even though

there was "clear deception," there "was not necessarily any intention to impose the losses on the

banks," as "the hope was that he would be able to cover them." *Id.* at 7:25-8:7. In pronouncing

judgment, the Court explained that the victim banks' "interests will be better served with you in

the community" and conditioned the judgment of probation on Mr. Khan making his best efforts

to comply with the Court's restitution order and performing community service. *Id.* at 32:12-18.

Counsel respectfully submit that the factors that supported the variance in *Khan* are at

least equally present here. Indeed, the Probation Department has recognized that, like Mr. Khan,

John sought to keep a struggling business afloat to ensure that his employees would not be left

without a job.  PSR ¶¶ 8, 48.  Given the similarities between John and Mr. Khan in terms of their lack of any prior criminal history, their respective offense conduct and the respective applicable Guidelines ranges, a sentence of incarceration would create "unwarranted sentence disparities" between similarly situated defendants.  Mr. Khan's case therefore also counsels in favor of a substantial downward variance here.

## CONCLUSION

For the reasons above, we respectfully request that the Court sentence John to a below-Guidelines sentence of probation, conditioned on his making restitution to BNB and Wallkill.

Dated: December 1, 2025          MORVILLO ABRAMOWITZ GRAND
       New York, NY               IASON & ANELLO P.C.

                                           */s/ Robert J. Anello*
                                           Robert J. Anello
                                         Jeremy H. Temkin
                                         Peter Menz
    565 Fifth Avenue
    New York, NY 10017
    Tel: (212) 856-9600
    Fax: (212) 856-9494
    ranello@maglaw.com
    jtemkin@maglaw.com
    pmenz@maglaw.com

    *Attorneys for John Mensch*