

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

CMM:AT
F. #2024R00297

*610 Federal Plaza*
*Central Islip, New York 11722*

July 1, 2026

<u>By ECF and Email</u>

The Honorable Nusrat J. Choudhury
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

> Re:     United States v. John Mensch
>         <u>Criminal Docket No. 24-334 (NJC)</u>

Dear Judge Choudhury:

The government respectfully submits this letter in connection with defendant John Mensch's sentencing in the above-captioned criminal matter, which is scheduled to take place on July 15, 2026.  For the reasons set forth below, the government respectfully requests that the Court impose a sentence within the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 46 to 57 months' imprisonment.

I.      <u>Background</u>

The defendant's conduct is outlined in the Probation Department's Presentence Investigation Report dated October 6, 2025, including the addendum dated November 25, 2025 (the "PSR").  As provided in the PSR, the defendant, the owner and Chief Executive Officer ("CEO") of a bus conglomerate[1] on Long Island, executed "check-kiting" scheme that defrauded several banks of millions of dollars.  PSR ¶¶ 5-9.  The check-kiting scheme that the defendant orchestrated was not a one-time mistake, or one bad action made in a moment of bad judgment and desperation.  According to the PSR, for more than a year, the defendant directed a coordinated scheme by which his employees, acting at his instruction, drew thousands of checks

---

[1]      According to the defendant's letter to the Court, the defendant's bus conglomerate had a fleet size of 750 vehicles, and the conglomerate employed over one thousand employees. <u>See</u> Sentencing Memorandum on Behalf of John Mensch, ECF No. 21 at Exhibit 1 (the "Defendant Letter"), page 3.

from two banks, totaling over $300,000,000.[2]  Those banks had placed their trust in the defendant and his conglomerate by offering expedited check-clearing privileges.  This trust was repeatedly abused.  PSR ¶ 7.  On a regular basis, the defendant and his coconspirators cycled checks between BNB and Wallkill, artificially inflating balances and maintaining the illusion of legitimate funds.  Id. ¶ 11.  Simultaneously, they siphoned real money out of the banks, using those proceeds to fund the conglomerate and pay salaries.  Id.  In total, the defendant stole approximately $9,326,366.03 from the banks.  Wallkill avoided catastrophic loss only because it discovered the scheme early, limiting its losses to "only" $775,413.27.  Id. ¶ 12.  Had Wallkill absorbed the remaining approximately $8.5 million, it likely would have been forced into bankruptcy.  Id.

II.    Guidelines Calculation

In the plea agreement, the government estimated that the defendant's total offense level, after acceptance of responsibility, would be 27.  The government estimated as follows:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(2)) | | 6 |
| Plus: | Loss Between $3.5M and $9.5M (U.S.S.G. § 2B1.1(b)(1)(J)) | +18 |
| Plus: | Substantially Jeopardized the Soundness of a Financial Institution (U.S.S.G. § 2B1.1(b)(17)(B)) | +4 |
| Plus: | Organizer, Leader, Manager or Supervisor of Criminal Activity (U.S.S.G. § 3B1.1(c)) | +2 |
| Less: | Acceptance of Responsibility | <u>-3</u> |
| Total: | | <u>27</u> |

In the PSR, Probation estimated that the total offense level after acceptance of responsibility was 25.  PSR ¶¶ 23-32.  Probation did not include a four-point enhancement for substantially jeopardizing the soundness of a financial institution because Wallkill did not collapse (-4).  Id.  The government does not challenge this.  Probation also included a four-point enhancement for being an organizer leader, instead of the two-point enhancement in the plea agreement (+2).  The government is not asking the Court to adopt the four-point enhancement at sentencing.  Thus, with an offense level of 23, and with a Criminal History Category of I, the applicable Guidelines range of imprisonment is 46 to 57 months.

---

[2]    According to the PSR, the defendant and his coconspirators drew 885 checks from Bridgehampton National Bank ("BNB") for approximately $347,668,442.21 and 974 checks from Wallkill Valley Federal Savings and Loan Associations ("Wallkill") for approximately $357,539,189.24.

III.    Legal Standard

The Supreme Court has explained that a "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).

Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Specifically, 18 U.S.C. § 3553(a) requires that, in imposing a sentence, a court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; [and]
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

IV.    The Appropriate Sentence

The § 3553(a) factors weigh heavily in favor of a sentence within the advisory Guidelines range of 46 to 57 months' imprisonment. Such a sentence is sufficient, but not greater than necessary, to reflect the nature and circumstances of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence.

The defendant's crime was undeniably serious. See 18 U.S.C. § 3553(a)(1), (2)(A). He exploited the trust that the victim banks placed in him and his conglomerate and stole approximately $9,326,366.03. Although the magnitude of the loss alone is substantial, the scope of the venture, and the need for deterrence both counsel against deviating from the Guideline range. See id. § 3553(a)(2)(A), (a)(2)(B).

First, the scope and duration of the defendant's criminal conduct warrant a Guidelines sentence. If the defendant had stolen approximately $9.3 million in a single act, his Guidelines would be the same. But that is not what happened here. This was not a one-time lapse in judgment—it was a sustained, deliberate course of criminal conduct. For more than a year, the defendant and his coconspirators wrote thousands of fraudulent checks, day after day. Each check represented a separate, conscious decision to commit a crime. The defendant could have stopped at any point. He did not. Instead, he chose—repeatedly and consistently—to continue victimizing others for his own financial gain.

Defendants often seek leniency on the ground that their conduct was aberrational—a brief departure from otherwise lawful behavior. That characterization does not apply here. Although the defendant may receive credit for acceptance of responsibility, his conduct demonstrates that the fraud was not an isolated mistake, but a sustained pattern of behavior. Indeed, far from being aberrational, during the scheme, fraud became routine.

The defendant's conduct following the charged scheme further underscores this point. Between 2020 and 2021, he submitted multiple fraudulent Payment Protection Program ("PPP") loan applications, seeking more than $3 million. The defendant's conglomerate received four PPP loans as follows:

| Date | Defendant Entity | PPP Amount |
|---|---|---|
| 5/1/2020 | Orange County Transit Service LLC | $1,762,030 |
| 2/11/2021 | Orange County Transit Service LLC | $1,763,820 |
| 5/4/2020 | EEBL Management Inc. | $90,222 |
| 3/15/2021 | EEBL Management Inc. | $107,625 |

In each application, the defendant falsely represented that neither he nor his businesses were involved in bankruptcy proceedings. That statement was untrue. The defendant and East End Bus Lines had entered Chapter 11 bankruptcy in 2018, and that case remained active through 2023. See 8-18-7616 (U.S. Bankruptcy Court, Eastern District of New York, ECF No. 1 at 4).[3] The applications themselves make clear that an affirmative answer to that question would have rendered the applicant ineligible for the loans. In other words, the defendant's misrepresentations were not incidental—they were necessary to obtain the funds.

A review of the public bankruptcy docket confirms that the proceedings were active during the time the applications were submitted. The defendant therefore knowingly made false statements to secure millions of additional dollars, even after engaging in the underlying fraud scheme. The defendant's conduct does not reflect a momentary lapse but rather a

---

[3] The defendant submitted a stipulation to the bankruptcy court that all revenue generated, and expenses incurred, by Orange County Transit Service LLC were deemed to be the property and obligations of the company that technically filed for bankruptcy. See 8-18-7616 (U.S. Bankruptcy Court, Eastern District of New York, ECF No. 352-3 at 10-11). And the defendant is the owner of Orange County Transit Service LLC, as stated in the PPP applications.

persistent and escalating pattern of fraud. A Guidelines sentence would appropriately reflect the seriousness of the offense. See 18 U.S.C. § 3553(a)(2)(A).[4]

Second, a significant term of imprisonment is necessary to afford adequate general deterrence. See 18 U.S.C. § 3553(a)(2)(B). "Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it." United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994); see also United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quotation marks and citation omitted)); United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

As Courts in this Circuit have recognized, "[t]he need for general deterrence is particularly acute in the context of white-collar crime." United States v. Johnson, No. 16 Cr. 457 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018), vacated on other grounds, Johnson v. United States, 144 F.4th 133 (2d Cir. 2025); accord United States v. Stein, No. 09 Cr. 377 (JBW), 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010); United States v. Marsh, No. 10-CR-480 (JBW), 2011 WL 5325410, at *1 (E.D.N.Y. Oct. 26, 2011) (noting people "choose to engage in white-collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished"); United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) ("[B]ecause many employees of financial institutions have the opportunity to commit similar offenses, and likewise find themselves subject to the temptations of those who handle large sums of money, a reasonably substantial term of incarceration is also appropriate to deter others similarly situated"); see also United States v. Cavera, 550 F.3d 180, 196 (2d Cir. 2008) (en banc) ("Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence.").

These cases all point to one conclusion: where, as here, the defendant's conduct was driven by greed the need for deterrence is greater. Although the defendant contends that the theft was undertaken to sustain his conglomerate and pay employee salaries, that narrative is belied by the record. During the relevant period, the defendant paid himself a salary of $368,846 in 2017 and $383,772 in 2018 (the same year the bus conglomerate declared bankruptcy). The

---

[4]     The government understands that the defense challenges that there was no PPP fraud on the part of the defendant given their reading of the PPP application forms and that Orange County Transit Service LLC and EEBL Management Inc., the entities that applied for the PPP loans, were not technically in bankruptcy. Nevertheless, these forms are meant to be read broadly. See Tradeways, Ltd. v. United States Dep't of the Treasury, No. CV ELH-20-1324, 2020 WL 3447767, at *13 (D. Md. June 24, 2020) (noting that the "SBA requires an applicant seeking a § 7(a) loan to disclose on its application, Form 1919, whether the borrower or its *affiliate* has 'ever filed for bankruptcy protection.'") (emphasis added); In re Gauri, 663 B.R. 88 (Bankr. N.D. Ill. 2024) (describing that when parent company was in bankruptcy, subsidiary companies were ineligible for PPP funds). The defendant clearly withheld this bankruptcy information from the SBA to acquire the loans.

PSR reflects that the defendant held substantial assets, yet there is no indication that he attempted to liquidate or leverage those assets to meet operating expenses during the time of the crisis. Instead, he chose to steal from financial institutions while maintaining his personal lifestyle. The timing of the fraud underscores the point: the year the defendant was engaged in the fraud scheme, he paid himself his highest salary in years.

The defendant's efforts to insulate his assets to avoid detection and make himself judgment proof only make the need for deterrence greater. Despite him claims that he lacks any financial sophistication, the defendant put a number of his assets in his wife's name. Although she asserts that the conglomerate could not function without the defendant, she also acknowledges that <u>she</u> is now the listed owner, and that the defendant's assets are held in her name or in trusts for others. Collectively, these assets appear to be worth millions of dollars. Although a sentence within the Guidelines' range would promote respect for the law and deter efforts to hide criminal ventures, a downward variance sends the opposite message.

<u>Finally</u>, it is worth emphasizing that the defendant advances internally inconsistent and incorrect positions about his role in the conglomerate. One the one hand, he insists that he is indispensable to the conglomerate, and that without him it may collapse. <u>See</u> Defendant Sentencing Memo at, <u>e.g.</u>, 40. On the other, he seeks to shift blame for both the criminal conduct and the company's descent into bankruptcy to his hand-picked CFO. <u>Id.</u> at 18, 19, 22, 24, 25. The defendant cannot have it both ways, and furthermore, neither of these contentions is true. The evidence firmly establishes that despite that the defendant blames his hand-picked CFO, he was the primary organizer and leader of this operation. The defendant was the only individual with a direct financial stake in the enterprise; it was his wholly-owned conglomerate that he purportedly sought to "save" (even as he paid himself millions through his fraudulent conduct). Moreover, despite the defendant's claim that the conglomerate cannot survive without him – according to him, he is apparently too big to fail – the reality is that his leadership led the firm to bankruptcy and led him to commit federal crimes. In fact, even the defendant's claims regarding collateral consequences are woefully inconsistent. He argues that, without him, schoolchildren will be left without transportation. Simultaneously, though, he contends that "predatory" competitors will seize his contracts, and ostensibly continue to provide those very services, during any period of incarceration. These arguments cannot be reconciled. Ultimately, the circumstances in which the conglomerate now finds itself are the product of the defendant's own decisions, including his theft of nearly $10 million from financial institutions. There is no evidence that the conglomerate would be worse off without his leadership; the record suggests the opposite.

The defendant advances a similar argument with respect to restitution. He emphasizes that he has engaged with victims and intends to repay them (notwithstanding that restitution and forfeiture will be ordered as a matter of course). But then he contends that, because the losses are so substantial, he should not be given a custodial sentence and instead should remain at liberty to earn money to repay what he stole. That reasoning is flawed, and accepting it would create a perverse result: the greater the theft, the stronger the claim against incarceration. That is not the law. Restitution is mandatory, and it is not a substitute for a term of imprisonment where one is otherwise warranted under the § 3553(a) factors. The defendant's obligation to repay his victims does not diminish the need for a sentence that reflects the seriousness of the offense, promotes respect for the law, and affords adequate deterrence.

The defendant's reliance on a single, allegedly comparable case–United States v. Khan, No. 13-CR-268 (E.D.N.Y.)–is misplaced.  That case was materially different and, as Judge Dearie recognized, "very unusual".  Transcript of Criminal Cause for Sentencing Before the Honorable Raymond J. Dearie, November 4, 2014 at 30:16-21 (the "Khan Transcript" or "Khan Tr.").

As reflected in Khan's sentencing memorandum, and expounded on during Khan's sentencing, the defendant in Khan stole substantially less than the defendant here, lived modestly, and critically, affirmatively notified the banks that the impending overdrafts.  Khan Tr. 9:1-3.  He even surrendered his passport, and the banks were sufficiently confident in his good faith that they did not view him as a flight risk.  Id. 16:6-15.  Moreover, there was a credible and extraordinary concern that the defendant in Khan faced a risk of execution if incarcerated, in part due to his vocal opposition to the Taliban.  Id. at 10:9-18, 25:13-16, and 29:22-30:7.[5]  On the issue of acceptance of responsibility, Judge Dearie remarked that, in nearly three decades on the bench, he had never seen an acceptance of responsibility demonstrated "more convincingly" than Khan.  Khan Tr. 30:22-31:6.

This case stands in stark contrast.  Here, the defendant accepted responsibility only at the margins.  At his plea, he repeatedly struggled to acknowledge that he had committed a felony, instead attributing his conduct to "usurious" loans and the actions of his hand-selected CFO.  See Transcript of Criminal Cause for Arraignment and Pleading Before the Honorable Nusrat J. Choudhury, October 2, 2024, at 39:2-47:10 (attached hereto as Exhibit 1).  His allocution reflected this deflection: "she then instructed me to deposit certain checks . . . and I participated in depositing those checks." (Id. at 41:13-17).  In his subsequent submission to the Court, the defendant continued to shift blame—to the William Floyd School District for nonpayment, see Defendant Letter at 3, and again to his CFO for arranging financing and managing the "float," including reliance on hard-money lenders.  Id. at 4.  Even now, he maintains that he believed others would resolve problems of his own making.

The defendant's persistent refusal to accept full responsibility is striking for the owner and CEO of the company that perpetrated the fraud.  Unlike the defendant in Khan—whose acceptance was extraordinary—this defendant minimized and deflected his responsibility, underscoring the inapplicability of that case and providing no basis for a comparable sentence.

This case is, instead, analogous to other check-kiting and bank fraud prosecutions in which courts have imposed substantial terms of imprisonment.  For example, United States v. Blassie, 3:25-CR-53 (S.D. Ill.), a 70-year-old defendant was sentenced to 63 months' imprisonment for a check-kiting scheme involving approximately $1.9 million.[6]  See ECF No. 15.  According to the plea agreement between Blassie and the government, the defendant's

---

[5]     Khan's support during the sentencing included law enforcement given that Khan facilitated communication between the FBI and the Muslim community after the events of 9/11.  Khan Tr. 22:4-13.  And even some of Khan's creditors were in the courtroom to support him, among others.  Id. 15:3-22.

[6]     The defendant also defrauded customers of the bank.

offense level was 26 after acceptance of responsibility, and his Criminal History Category was I, leading to a Guidelines range of 63 to 78 months' imprisonment. <u>See</u> ECF No. 14.[7]

Similarly, in <u>United States v. Malkhasyan</u>, 2:19-CR-287 (C.D. Ca.), the defendant was sentenced to 81 months' imprisonment for his role in a multi-defendant bank fraud scheme involving the use of altered passports, forged cashier's checks, and the rapid withdrawal of fraudulently obtained funds before detection. <u>See</u> <u>Malkhasyan</u>, ECF No. 477 at 1 (Defendant's Objections to PSR). Although the defendant also received a consecutive 24-month sentence for aggravated identity theft, the underlying Guidelines range for the fraud conduct—based on a loss of between $1.5 and $3.5 million—was 87 to 108 months. The defendant in that case also sought leniency based on personal circumstances, including his desire to spend time with his children and the fact that he had already served approximately 15 months in custody during the COVID-19 pandemic.[8]

These cases underscore that significant custodial sentences are the norm for fraud schemes involving far smaller losses than those at issue here, even where defendants present mitigating personal circumstances.

---

[7] According to the plea agreement, the government agreed to recommend at the low end of the Guidelines range found by the court.

[8] The defense also argued that because he was an Armenian citizen, the defendant would likely be deported after serving his sentence, thus making it virtually impossible for him to be in his children's lives.

V.        Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a term of imprisonment of 46 to 57 months' imprisonment, along with restitution and forfeiture.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:        _____/s/_____
Adam R. Toporovsky
Assistant U.S. Attorney
(631) 715-7846

cc:    Clerk of Court (NJC) (via ECF and email)
Counsel of Record (via ECF and email)