# MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
THOMAS A. McKAY
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG
LISA ZORNBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

———

WRITER'S CONTACT INFORMATION

ranello@maglaw.com
(212) 880-9520

COUNSEL
JOSHUA BUSSEN
PIPPA HYDE***
KEFIRA WILDERMAN

RETIRED/PARTNER EMERITUS
PAUL R. GRAND

———

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHNGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT
***ALSO ADMITTED IN ENGLAND AND WALES

July 6, 2026

The Honorable Nusrat J. Choudhury
United States District Judge
Eastern District of New York
100 Federal Plaza, Courtroom 1040
Central Islip, NY 11722

> **Re:** **United States v. John Mensch, 24-cr-00334 (NJC) (ARL)**

Dear Judge Choudhury:

This firm represents John Mensch, who is scheduled to be sentenced by your Honor on Wednesday, July 15, 2026. I write to address several matters raised by the government in its letter dated July 1, 2026 (ECF No. 28).

In its letter, the government agrees that John's adjusted offense level is 23 and that he falls in Criminal History Category I. The government also does not dispute most of the underlying issues identified in the Sentence Memorandum Submitted on Behalf of John Mensch (ECF No. 21) that support a non-custodial sentence, including ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ and his decades-long commitment to and volunteer work on behalf of ▮▮▮▮▮▮▮▮▮▮▮▮.

Nor does it dispute that, starting before the subject conduct, John and the School Bus Companies were victims of a prolonged assault by predatory "hard money lenders" who were, in fact, "loan sharks who perpetrated a massive fraud on desperate merchants" like John and the School Bus Companies, *People by James v. Richmond Capital Group LLC*, 80 Misc.3d 1213(a), at *2 (N.Y. Cty. Sup. Ct. Sep. 15, 2023); that John and the School Bus Companies ultimately paid millions of dollars in usurious interest to these loan sharks, several of whom were later charged with unlawful lending by the Federal Trade Commission (the "FTC"), the New York Attorney General (the "NYAG"), and the New Jersey Attorney General (the "NJAG"); and that the School Bus Companies were identified as victims in those cases. *See* ECF No. 21 at 26-30,

57-59.  The government does not contest that the Court can (and should) consider this victimization in imposing a sentence that serves the goals set forth in 18 U.S.C. § 3553(a).[1]

Although the government criticizes John for identifying the School Bus Companies' contract dispute with the William Floyd School District as a source of financial distress and his description of the role that Majo Jacinto, the CFO of the School Bus Companies,[2] played in the offense conduct (ECF No. 28 at 6), it also does not dispute either (1) that the financial distress caused by the contract dispute contributed to the conditions underlying the offense, or (2) that Dr. Jacinto was a key participant in the offense, including her role in introducing the loan sharks as a source of financing for the School Bus Companies.[3]

_____

[1] Remarkably, although the FTC, the NYAG, and the NYAG each brought enforcement actions against the "hard money lenders" *after* the School Bus Companies filed for bankruptcy, the loan sharks were not unknown to law enforcement in the Eastern District of New York at the time they were victimizing John and the School Bus Companies.  Indeed, a key executive at Richmond Capital Group, which repeatedly provided funding to the Bus Companies, began working as a loan shark while out on bail for an unrelated drug trafficking offense in the Eastern District of New York.  *See* Michael S. Schmidt et al, "A Troubling Trump Pardon and a Link to the Kushners," N.Y. TIMES, Nov. 26, 2023.  As reported by the New York Times, this executive, "[f]or reasons that remain unexplained… was permitted by the U.S. attorney's office in Brooklyn to live relatively freely," and "[f]ormer prosecutors and defense lawyers said they had never heard of a defendant being allowed to delay sentencing for such a long period or using his freedom to engage in the conduct he did."  *Id.*

[2] The government disingenuously refers to the School Bus Companies as a "conglomerate."  To this day, the School Bus Companies are a small, family-run player in a business otherwise dominated by private equity or venture capital backed entities.  By way of example, First Student, Inc., which is owned by a Swedish private equity firm describes itself as "the largest school transportation provider in North America" and serves 1,300 districts across 42 states and 8 Canadian provinces; Sequoia Capital-backed Zūm serves 4,500 schools and districts across 18 different states; and Audax Private Equity-backed Beacon Mobility has acquired and now operates 27 smaller school bus companies like John's.  *See* First Student, Inc., "An Introduction to First Student," available at https://firststudentinc.com/wp-content/uploads/2456_FS_AboutFSServicesOnePgr_G-2.pdf; Zūm, "Stamford Public Schools Partners with Zūm to Modernize Student Transportation," available at https://www.ridezum.com/press-release/stamford-public-schools-partners-with-zum-to-modernize-student-transportation/; Beacon Mobility, "Our Companies," available at https://gobeacon.com/companies/.

[3] Dr. Jacinto pled guilty to bank fraud conspiracy, and the Probation Department has found that she "had significant decision-making authority within the [Bus Companies], understood the overall scope and structure of the scheme, was heavily involved in the planning of the offense,

Finally, the government also fails to recognize the extraordinary steps that John has taken to provide restitution to the two banks that suffered losses as a result of the offense conduct. Thus, although John is insolvent as a result of personal judgments obtained by the loan sharks and could never personally satisfy a restitution award to be included in the judgment of conviction, he has arranged for the School Bus Companies to fund settlements that already have resulted in the banks receiving over $1.9 million.

In claiming that John should be sentenced within the Guidelines range, the government makes several inaccurate statements and irrelevant arguments, which we address below.[4]

A. **The School Bus Companies Properly Applied for Relief Under the Paycheck Protection Program**

The worldwide COVID-19 pandemic presented unique challenges to privately owned school bus companies, given that many school districts (especially those in the Northeastern United States, where the School Bus Companies operate) suspended in-person education entirely. John nevertheless maintained his workforce and provided exemplary service to the communities with whom the School Bus Companies had contracts. (ECF No. 21 at 42.) Like many small business operators, in 2020 and 2021, John appropriately obtained and used Paycheck Protection Program ("PPP") loans – as was intended – to help overcome the difficulties posed by the pandemic.

In its letter, the government incorrectly asserts that John improperly submitted PPP loan applications on behalf of Orange County Transit Service LLC ("Orange County Transit Service") and EEBL Management, Inc. ("EEBL"). Specifically, the government asserts that "[i]n each application, [John] falsely represented that neither he nor his businesses were *involved* in bankruptcy proceedings." (ECF No. 28 at 4 (emphasis supplied).)

---

and had autonomy over her decisions" and therefore that she qualified as an organizer or leader of the offense. We are unable to determine whether Dr. Jacinto has been sentenced since her case remains sealed and the Government has not disclosed to the defense any information regarding Dr. Jacinto's sentencing, notwithstanding your Honor's Order pursuant to Rule 5(f) of the Federal Rules of Criminal Procedure. (ECF No. 10.)

[4] The government's argument that a Guidelines sentence is warranted because the conduct at issue continued over an extended period and therefore is not aberrational (*see* ECF No. 28 at 4) is a strawman. Although the government addresses an argument "often" raised by other defendants seeking downward variances, it either ignores or mischaracterizes the arguments asserted in our Sentencing Memorandum.

The government's cavalier accusation is misguided and predicated on its misinterpretation of the PPP application form. As described below, the government's position contravenes the longstanding interpretation of the application form by the Small Business Administration (the "SBA"), which was charged with running the PPP. The prohibition only applies to entities that were debtors in bankruptcy or were owned by debtors in bankruptcy, and here, neither the companies that obtained PPP loans nor John were debtors in bankruptcy. Were that not enough, the factual context surrounding the applications demonstrates that John did not attempt to hide the ongoing bankruptcy proceedings, defeating any inference of improper intent.

The form used by the SBA required both the companies applying for PPP loans (here, Orange County Transit Service and EEBL) and any owner of those companies (for both companies, John) to certify that they were not "presently involved in any bankruptcy." When the SBA first promulgated the application form, courts found this language "so vague as to be almost meaningless." *In re Skefos*, 2020 WL 2893413, at *10 (Bankr. W.D. Tenn. June 2, 2020); Transcript of Hearing, *Hidalgo Cty. Emergency Service Found. v. Carranza*, No. 20-ap-2006, ECF 17 at 30:21-23 (Bankr. S.D. Tex. Apr. 24, 2020) ("[THE COURT]: To have a form that simply says if an owner or a business is presently involved in a bankruptcy, I have zero idea what that means."). In addressing the confusion, the SBA explained that, in an "effort to activate the PPP as quickly as possible," it had used a "pre-existing form," rather than drafting more precise language. *Skefos*, 2020 WL 2893413, at *9. Just weeks later, the SBA adopted a more detailed rule that explained the bankruptcy exclusion with more clarity: the disbursement of PPP funds would be forbidden only if "the applicant or the owner of the applicant is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed[.]" *See* Small Business Administration, *Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Promissory Notes, Authorizations, Affiliation, and Eligibility*, 85 Fed. Reg. 23450, 23451 (Apr. 24, 2020) (the "Fourth Interim Rule").

As courts recognized, the Fourth Interim Rule "explicitly clarified that bankruptcy *debtors* are ineligible to receive PPP funds,"[5] and later guidance by the SBA reaffirmed that the bankruptcy exclusion was limited to actual debtors, rather than any entity with a less direct link to a bankruptcy proceeding:

---

[5] *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 411 (2d Cir. 2022) (emphasis added); *Skefos*, 2020 WL 2893413, at *10 (describing the SBA's "later clarification that SBA intends to exclude applicants or entities owned by an applicant that 'is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed'"); Transcript of Hearing, *Cosi, Inc. v. U.S. Small Business Admin.*, Adv. Pro. No. 20-50591, ECF No. 141 at 58:6-13 (Bankr. D. Del. May 5, 2020) ("There was an open question earlier… [b]ut the recent rule is abundantly clear that the administrator has, in fact, determined to exclude debtors from participation in the PPP.").

> If an applicant or owner has filed a Chapter 7 bankruptcy petition, the applicant or owner is considered to be "presently involved in any bankruptcy" for PPP eligibility purposes until the Bankruptcy Court has entered a discharge order in the case. If an applicant or owner has filed a Chapter 11, 12 or 13 bankruptcy petition, the applicant or owner is considered to be "presently involved in any bankruptcy" for PPP eligibility purposes until the Bankruptcy Court has entered an order confirming the plan in the case.

Small Business Administration, *Paycheck Protection Program Loans: Frequently Asked Questions* at 67, available at https://www.sba.gov/sites/default/files/2021-04/PPP%20FAQs%204.6.21%20FINAL-508.pdf (Apr. 6, 2021).

Numerous debtors challenged the bankruptcy exclusion, leading to extensive litigation over the policy. Consistent with the SBA's interpretation, in defending the policy, the government uniformly described the "presently involved" language as "an SBA policy that precludes ***entities in bankruptcy*** from participating in the PPP."[6] We are not aware of any regulation, guidance, or court ruling that construed the "presently involved" language to have the broader meaning that the government attempts to ascribe to it in this case—an absence that is particularly notable given the extensive number of civil enforcement actions that the federal government has brought against PPP applicants.[7]

---

[6] Brief for Appellant, *Springfield Hospital, Inc. v. Guzman*, Nos. 20-3902, 20-3903, ECF No. 39 at 5 (2d Cir. Mar. 22, 2021); *id.* at 14 ("SBA adopted a policy making ***entities in active bankruptcy*** ineligible to receive PPP loans.") (emphasis added); Brief for Appellant, *In re: Hidalgo County Emergency Service Foundation*, No. 20-40368, ECF No. 33 at 13 (5th Cir. June 12, 2020) ("Under its authority to promulgate regulations to implement this critical and time-sensitive program, SBA has determined that PPP loans should not be made to ***applicants in bankruptcy***.") (emphasis added); Brief for Appellant, *USF Federal Credit Union v. Gateway Radiology Consulting, P.A.*, No. 20-13462, ECF No. 27 at 31 (11th Cir. Oct. 13, 2020) ("SBA's policy of excluding ***debtors in bankruptcy*** from PPP loan eligibility reflects a reasonable effort to implement the statutory "sound value" requirement.") (emphasis added).

[7] Department of Justice, "Fact Sheet: False Claims Act Settlements and Judgments, FY 2025," available at https://www.justice.gov/opa/media/1424126/dl (noting that DOJ, during fiscal year 2025, "obtained more than 200 False Claims Act settlements and judgments... resolving allegations of pandemic-related fraud" and has "collected over $820 million in civil settlements and judgments" relating to pandemic relief fraud to date).

Here, Orange County Transit Service and EEBL (the entities that received the PPP loans) were not among the School Bus Companies that filed for bankruptcy,[8] and John (the owner of Orange County Transit Service and EEBL) also did not file an individual bankruptcy petition.[9] Thus, the PPP applications were consistent with the policy expressed by the SBA and applied by the government in other cases. The government offers no authority for the proposition that applications that fully complied with the SBA's longstanding policy can be deemed false by virtue of Orange County Transit Service's relationship with one of the School Bus Companies that filed for bankruptcy. (ECF No. 28 at 4, n.3). To the contrary, the case law suggests that non-debtor affiliates of bankrupt entities (*i.e.*, the precise situation occupied by Orange County Transit Service) successfully applied for PPP loans that were later forgiven. *See, e.g.*, *In re Westbank Holdings, LLC*, 2022 WL 3052135, at *12 (E.D. La. Aug. 1, 2022).[10]

---

[8] The filing entities were East End Bus Lines, Inc.; Montauk Student Transport LLC; Montauk Transit Service LLC; East End Bus Service LLC; and Montauk Transit LLC.

[9] Contrary to the government's assertion (ECF No. 28 at 4), John did not "enter Chapter 11 bankruptcy in 2018." The Voluntary Petition for Non-Individuals Filing for Bankruptcy cited by the government identifies East End Bus Lines, Inc. as the debtor and was signed by Mr. Mensch in his capacity as an authorized representative of the debtor. (*Id.* at 4, citing 8-18-7616 (U.S. Bankruptcy Court, Eastern District of New York, ECF No. 1 at 4)).

[10] The government's reliance on *Tradeways, Ltd. v. United States Dep't of the Treasury,* No. CV ELH-20-1324, 2020 WL 3447767, at *13 (D. Md. June 24, 2020) is misplaced. Although the government cites *Tradeways* for the proposition that "these forms are meant to be read broadly," ECF No. 28 at 5, n.4, it quotes language from an entirely different SBA form, which specifically requires the disclosure of "whether the borrower or its affiliate has 'ever filed for bankruptcy protection.'" *Compare* ECF No. 28 at 5, n.4 with Form 1919, available at https://caweb.sba.gov/library/pdf/Form1919_Borrower_Information.pdf. The district court discussed this form in *Tradeways* to show that the SBA had historically considered bankruptcy as a factor in disbursing loans (such that the policy excluding debtors in bankruptcy from participating in the PPP program was not arbitrary or capricious), not to graft a broader meaning onto the form that Orange County Transit Service and EEBL actually submitted. The PPP loan applications submitted on behalf of Orange County Transit Service and EEBL used a different form, which, as described above, did not include language seeking information about affiliation with an entity that had filed for bankruptcy.

The government also cites *In re Gauri*, 663 B.R. 88 (Bankr. N.D. Ill. 2024), for the proposition that "when parent company [sic] was in bankruptcy, subsidiary companies were ineligible for PPP funds." (ECF No. 28 at 5, n.4.) *Gauri*, however, has no bearing here, where the debtors in bankruptcy and loan applicants did not have a parent-subsidiary relationship, and the form in question called for disclosure of bankruptcy proceedings involving an "owner," but did not call for information regarding proceedings involving affiliated companies.

Not only were the PPP applications properly completed, but the factual context demonstrates that John never intended to hide the ongoing bankruptcy.  Given the need to disburse PPP funds expeditiously, the SBA delegated the authority to make PPP loans to private lenders, who were responsible for assessing eligibility for the program.  The PPP applications at issue here were submitted to and reviewed by TD Bank, N.A., where John and the Bus Companies had banked for years and which was fully aware of the bankruptcy.  Indeed, the entities that had filed Chapter 11 petitions maintained their debtor-in-possession accounts at TD Bank, which noted the bankruptcy court case numbers on the account statements and on checks written from those accounts.  *See In re East End Bus Lines, Inc.*, ECF No. 583 at 9 (Bankr. E.D.N.Y. June 8, 2020); ECF 585 at 12 (Bankr. E.D.N.Y. June 8, 2020).

Finally, the government's accusations of impropriety are notable for what is not alleged.  While focusing on the applications themselves, the government makes no suggestion that the PPP loans were used for purposes other than sustaining the applicants' work forces at an unprecedented time of upheaval for privately owned school bus companies.  Significantly, in a separate review process, the SBA subsequently forgave the PPP loans in question, further refuting the government's allegation of impropriety.

## B.  Considerations of Deterrence Do Not Warrant Incarceration

The government does not dispute that incarceration is unnecessary to serve the goal of specific deterrence, and it fails to address both the cases from this district concluding that general deterrence can be served through a non-custodial sentence and the substantial consequences John has already borne as a result of his conviction.  (*See* Sentence Memorandum, ECF No. 21, at 62-63.)

Rather, the government argues that there is a heightened need for deterrence because John's conduct was purportedly driven by "greed."  (ECF No. 28 at 5.)  Especially in light of the undisputed role of loan sharks in exacerbating the School Bus Companies' financial crisis, the government's "greed" argument is misplaced.  Its assertion that John "paid himself millions through his fraudulent conduct" (*id.* at 6) is not only wrong, it is actually contradicted by the description of John's compensation earlier in the letter (*see id*. at 5).[11]  Moreover, the

---

[11] The reasonableness of John's pre-bankruptcy compensation is corroborated by the fact that the Bus Companies' plan of reorganization, which was heavily negotiated with their largest creditors, expressly contemplated that John would continue to work for the Bus Companies at a salary of $350,000 per year.  *See In re East End Bus Lines, Inc.*, ECF No. 833 at 6 (Bankr. E.D.N.Y. Nov. 3, 2022).  As the PSR notes, "[t]he United States Trustee did not file any objections to the plan and no creditors voted against it."  PSR ¶ 71.  Neither did the two banks that were impacted by the offense conduct or the Internal Revenue Service, which was a creditor

The Honorable Nusrat J. Choudhury
July 6, 2026
Page 8

government does not dispute the fact that the proceeds of the offense went to keep the School Bus Companies afloat, including paying salaries to the drivers and other employees and repaying the hard money lenders that had advanced funds at usurious rates used in the operations of the business.

The government next argues that "[t]he PSR reflects that the defendant held substantial assets, yet there is no indication that he attempted to liquidate or leverage those assets to meet operating expenses during the time of the crisis." The PSR, however, reflects John's (and his spouse's) assets in 2025 and therefore does not support an argument that seven to eight years earlier,[12] he had any assets with sufficient equity to alleviate the School Bus Companies' dire financial straits.

More importantly, the government's assertion ignores the facts. Throughout 2016, 2017, and 2018, John gave personal guarantees to the hard money lenders providing usurious loans to the School Bus Companies, leading to millions of dollars in personal judgments being entered against John after the bankruptcy filing. *Id.* at 35. Additionally, it is beyond dispute that in the year leading up to the offense conduct, John repeatedly leveraged his and the School Bus Companies' assets to secure financing for the School Bus Companies. As the School Bus Companies' financial situation deteriorated, John mortgaged properties that he owned, either personally or through single-member LLCs, to secure loans from The Credit Junction ("TCJ"), a commercial lender. Thus, as described in filings in the bankruptcy court:

- In December 2016, John granted TCJ a $400,000 mortgage on a property that he owned at 4 Private Road, in Mastic, New York;

- In September 2017, Novak Properties, LLC (a single member LLC then owned by John) granted TCJ a $2,000,000 mortgage on a property that it owned on Montauk Highway in Center Moriches New York; and

- Also in September 2017, KTJ Properties, LLC (another single member LLC then owned by John) granted TCJ a $750,000 mortgage on a property that it owned at 3601 Horseblock Road in Medford, New York, which was then being used as the School Bus Companies' primary bus yard.

---

in the bankruptcy proceeding and was represented by the Office of the United States Attorney for the Eastern District of New York.

[12] The offense conduct occurred between October 2017 and September 2018. *See* PSR Addendum at 3, addressing objection to ¶ 8.

*See In re East End Bus Lines, Inc.*, ECF No. 671 at 3-4; ECF No. 671-1 at 10-51 (Bankr. E.D.N.Y. January 14, 2021).  Subsequently, in February 2018, during the course of the offense conduct, John also obtained funds for the School Bus Companies by arranging for a $2 million loan secured by the School Bus Companies' remaining equity in its equipment.  *See* Sentencing Memorandum, ECF No. 21 at 33.

The government's further assertion that John has sought to insulate his assets and make himself judgment proof defies reality and demonstrates a lack of familiarity with the underlying facts.  The circumstances surrounding the transfer of the School Bus Companies to John's wife are set forth in detail in the PSR (¶¶ 70-71) and our Sentencing Memorandum (ECF No. 21 at 41-42).  The government's insinuation of impropriety regarding the transfer ignores the fact that it was (1) necessitated by the illegal conduct of the usurious hard money lenders who obtained personal judgments that rendered John insolvent, and (2) agreed to by the School Bus Companies' creditors, approved by the Bankruptcy Court without objection by the United States Trustee, the two banks affected by the offense conduct, or the IRS, which was represented by the Office of the United States Attorney for the Eastern District of New York.  Moreover, the government's repeated reference to John's assets without acknowledging his even more substantial liabilities defies the reality that John is insolvent, such that any attempt to transfer assets without addressing his liabilities would be subject to claims of fraudulent conveyance.

## C.  Other Factors Weigh Against Incarceration

In addressing the need to avoid unwarranted sentencing disparities, our Sentencing Memorandum noted that John's conduct and record are similar to the defendant in *United States v. Khan*, who Judge Dearie sentenced a period of probation.  (ECF No. 21 at 64-66).  The government attempts to distinguish *Khan* by arguing that (1) the loss in that case was substantially less than the loss in here, the defendant lived modestly and, through counsel, had affirmatively notified the victim banks of the overdrafts; (2) the defendant had surrendered his passport and the victim banks did not view him as a flight risk; (3) Khan "faced a risk of execution if incarcerated"; and (4) Judge Dearie commented that Khan had demonstrated a extraordinary level of acceptance of responsibility.  (ECF No. 28 at 7 (emphasis in original).)

The government's arguments studiously ignore the precise reason why the defense highlighted *Khan* as instructive here: unlike other bank fraud cases, both John and Khan had engaged in the offense conduct in a misguided, last-ditch effort to save a struggling business.  That shared motivation distinguishes the two cases the government cites as purportedly more analogous to John's, both of which involved acts of bank fraud committed for personal enrichment (combined with aggravating acts of fraud and deception), with no evidence of the

mitigating factors present in John and Khan's cases.[13]  Moreover, recognizing that no two cases are identical, the distinctions identified by the government are either non-existent or overstated.

- While the loss in Khan's case ($4.8 million) was less than the loss here, both cases applied the same 18-level loss enhancement, and Khan's Guidelines range (63-78 months) were actually higher than the 46–57 month range applicable in this case. Khan Tr. 14:12-16.

- When Khan realized that he could no longer "keep the balls in the air," he retained counsel who affirmatively notified the banks of the overdrafts, *id.* at 15:23-16:15, whereas John (1) consulted counsel who put the School Bus Companies into bankruptcy and listed the amounts owed to the banks in the debtors' first-day filings (*See In re East End Bus Lines, Inc.*, ECF 1 at 20, 22 (Bankr. E.D.N.Y. Sept. 13, 2018)); and (2) participated without counsel in meetings with the banks, even consenting to being recorded during multiple meetings with BNB Bank.

- Like Khan, John did not lead a lavish lifestyle but rather used the proceeds of the offense to keep his business afloat under trying circumstances.  While Khan's financial straits were attributable to his clients' inability to pay their debts, *see id.* at 16:20-18:18, John's resulted from the confluence of the usurious interest charged by hard money lenders and the contract dispute with a large customer (the William Floyd School District).

---

[13] Specifically, according to a stipulated statement of facts and the government's sentencing memorandum, the defendant in *United States v. Blassie*, 3:25-CR-30053 (S.D. Ill.), kited checks between personal bank accounts (including accounts at a bank where he served as an executive) in order to "pay personal expenses" (including "spending hundreds of thousands of dollars on gifts and other payments to young women, some of whom he had extramarital affairs with"); abused his position as a bank executive to fraudulently alter compliance reports that would have exposed his kiting; and separately defrauded two bank customers out of $489,000 of their retirement savings.  *United States v. Blassie*, 3:25-CR-30053, ECF No. 15 ¶¶ 4, 7-8, 12, 18; ECF No. 26 at 1-2 (S.D. Ill. May 19, 2025).  *United States v. Malkhasyan*, No. 2:19-CR-287 (C.D. Cal.), is similarly inapposite.  There, the defendant and eight co-conspirators used at least 331 fraudulently altered passports to open bank accounts at Bank of America and Wells Fargo; waited until the banks deemed the accounts legitimate; and then used forged or fraudulent checks to inflate the balances in this account before withdrawing money at "casino ATMs in Las Vegas and elsewhere."  *United States v. Malkhasyan*, No. 2:19-CR-287, ECF No. 296 at 8-10 (C.D. Cal. Apr. 8, 2021).  The 81-month sentence referenced in the government's letter (ECF No. 28 at 8) actually reflected 57 months for bank fraud and a consecutive 24 months for aggravated identity theft.  *Malkhasyan*, No. 2:19-CR-287, ECF No. 491.

The Honorable Nusrat J. Choudhury
July 6, 2026
Page 11

- Like Khan, John was never viewed as a flight risk. Indeed, in the present case, the banks did not express any concerns about John remaining at liberty since they learned of the conduct in 2018, and the government agreed that John could be released on an unsecured bond when charges were filed in October 2024 (six years after the conduct was revealed).

- Contrary to the government's argument, Khan was not concerned that he would be executed if he were incarcerated. Rather, his concern was that, due to "his [family's] support for a democratic Pakistan and his vocal anti-Taliban stance," he would be targeted if he were deported to Pakistan. *Id.* at 25:13-16, 29:22-30:7.

- The government's reference to John's plea allocution in the context of Judge Dearie's comments regarding Kahn's acceptance of responsibility is puzzling since Khan entered his guilty plea before a magistrate judge and Judge Dearie apparently had concerns regarding the sufficiency of the allocution. *Id*. at 26:19-27:2.[14] Similarly, just as Kahn's counsel provided details regarding the events leading up to the offense conduct (Khan Tr. 16:20-18:17), in our Sentencing Memorandum, we have tried to contextualize John's offense. Explaining the circumstances that led John to commit the crimes for which he stands before the Court is not inconsistent with fully accepting responsibility for his misconduct. (*See* ECF No. 21-1 at 3).

Finally, the government criticizes the defense's assertion that John both (1) is essential to the continued operation of the business and (2) relied on the School Bus Companies' CFO to manage its financial operations. (ECF No. 21 at 6). Two things, however, can be true at the same time. As our Sentencing Memorandum makes clear, John, who grew up in the school bus business but only attended two non-contiguous semesters of college, handled the operations side of the business while Dr. Jacinto managed its financial functions. While critiquing this argument as supposedly inconsistent, the government offers no factual evidence to rebut the accounts of John's customers and employees (ECF Nos. 21-11 through 21-18), who uniformly praised John's leadership, responsiveness, and work ethic, which have allowed the School Bus Companies to succeed where other providers have failed. (ECF No. 21 at 44-45).

John's importance to the School Bus Companies is demonstrated by his impressive success in navigating them through the COVID crisis and a nationwide school bus driver shortage, and rebuilding them as they emerged from bankruptcy. It is through that continued success that the banks will receive meaningful restitution. Although the government is correct that restitution is mandatory, as reflected in the PSR, John is insolvent. Thus, restitution will

---

[14] Although your Honor initially expressed concern with respect to whether Mr. Mensch's factual allocution satisfied the intent requirement, Plea Tr. at 41:25-42:3, after hearing from counsel, your Honor agreed that the allocution had been sufficient, *id.* at 46:12-47:8.

depend on the revenues generated by the School Bus Companies, which are not defendants in this case. Significantly, through John's efforts the banks already have received a total of $1,907,500, none of which would have available to satisfy a restitution order.

\* \* \*

For the reasons set forth above and in our Sentencing Memorandum (ECF No. 21), I respectfully request that the Court sentence John to a period of probation conditioned on his making restitution to BNB and Wallkill.

Respectfully submitted,

MORVILLO ABRAMOWITZ GRAND
    IASON & ANELLO P.C.

/s/ Robert J. Anello
Robert J. Anello

*Attorneys for John Mensch*

cc:      Counsel of Record (via ECF and email)