# MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
THOMAS A. McKAY
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG
LISA ZORNBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION

ranello@maglaw.com
212-880-9520

COUNSEL
JOSHUA BUSSEN
PIPPA HYDE***
KEFIRA WILDERMAN

RETIRED/PARTNER EMERITUS
PAUL R. GRAND

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT
***ALSO ADMITTED IN ENGLAND AND WALES

October 27, 2025

<u>**Via Email**</u>
United States Probation Officer Meghan Wing
United States Probation Office, Eastern District of New York
220 Federal Plaza
Central Islip, NY 11722-9012
Meghan_Wing@nyep.uscourts.gov

Re:     *United States v. John Mensch*, No. 24 Cr. 334 (NJC)

Dear Officer Wing:

As you know, this firm represents John Mensch in the above-referenced matter.  I have received the draft presentence investigation report dated October 6, 2025 (the "PSR"), and I am grateful for your attention to and careful consideration of Mr. Mensch's case.  In accordance with Fed. R. Crim. P. 32(f)(1), I write to provide you with certain objections, clarifications, and corrections to the PSR, with supporting documentation attached as necessary.  My comments are set forth below with reference to the paragraphs of the PSR to which they relate.

## MR. MENSCH'S EFFORTS TO ACHIEVE RESTITUTION

As an initial matter, as I explained in my letter dated October 10, 2025, Mr. Mensch has taken concrete steps to ensure the victims of the offense conduct receive full restitution, including having made substantial payments prior to sentencing and personally guaranteeing future payments.  Although this information was not available at the time the draft PSR was completed, it is, of course, highly relevant to Mr. Mensch's sentencing and should be included in the PSR.  Accordingly, I request that the following paragraphs of the PSR be amended to incorporate this information (with my requested additions in bold):

**PSR ¶ 13:**     The provisions of the Mandatory Victim Restitution Act of 1996 apply to this Title 18 offense. As noted above, BNB suffered a loss of $8,550,952.76 and Wallkill suffered a loss of $775,413.27, for a total loss of $9,326,366.03. Contact information was provided for Wallkill and BNB, and an Affidavit of Loss, which

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 2

allows them opportunity to provide a victim impact statement and financial loss information, was forwarded to their respective representatives. As of disclosure of the presentence report, responses have not been received. **In 2025, Mr. Mensch entered into agreements with BNB and Wallkill in an effort to ensure that both Wallkill and BNB are compensated fully for their losses. Wallkill and its insurer, Zurich American Insurance Company ("Zurich") already have received payments of $212,500, and BNB already has received $1,500,000. These agreements further commit Mr. Mensch to repay a total of $775,000 to Wallkill and Zurich, and a total of $8.2 million to BNB. Wallkill and Zurich will be paid an additional $37,500 before the December 11, 2025 sentencing date and will be paid the balance over 50 months. BNB will be paid an additional $70,000 before the December 11, 2025 sentencing date and will be paid the balance over 12 years.**

**PSR ¶ 118:**      Statutory Provisions: Pursuant to 18 U.S.C. §3663A, restitution shall be ordered in this case. As detailed in the Victim Impact section of this report, restitution is due and owning in the amount of $9,326,366.03 to the victims. All payments**, less any amounts previously paid,** should be forwarded to the Clerk of the Court, United States District Court, Eastern District of New York, 225 Cadman Plaza East, Brooklyn, New York 11201. **In 2025, Mr. Mensch entered into agreements with BNB and Wallkill in an effort to ensure that the banks are compensated fully for their losses. Wallkill and Zurich already have received payments of $212,500, and BNB already has received $1,500,000. These agreements further commit Mr. Mensch to repay a total of $775,000 to Wallkill and Zurich and a total of $8.2 million to BNB. Wallkill and Zurich will be paid an additional $37,500 before the December 11, 2025 sentencing date and will be paid the balance over 50 months. BNB will be paid an additional $70,000 before the December 11, 2025 sentencing date and will be paid the balance over 12 years.**

## GENERAL OBJECTION REGARDING DESCRIPTION OF OFFENSE CONDUCT

As the draft PSR appropriately recognizes, the offense conduct arose out of efforts to ensure the survival of a struggling school bus transportation business ("East End"). *See* PSR ¶¶ 9-10, 21. East End's financial problems were exacerbated by its victimization by illegal usurious lending arrangements into which it entered with "hard money lenders" to which it was introduced by Dr. Jacinto, as well as a significant dispute involving the William Floyd School District. PSR ¶¶ 21, 72. As noted in PSR ¶¶ 9-10, Mr. Mensch and Dr. Jacinto engaged in the transactions at issue in this case "to meet various financial obligations incurred by East End that East End was otherwise unable to meet." At times, however, the PSR refers to funds being made available to Mr. Mensch and Dr. Jacinto individually (*e.g.*, PSR ¶ 12); states that Mr. Mensch and Dr. Jacinto had accounts at the bank (PSR ¶ 11); or states that all proceeds were used "at

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 3

[Mr. Mensch's] discretion" (PSR ¶ 15).  These references inaccurately suggest that the principal use of the fraudulent transactions was Mr. Mensch and Dr. Jacinto's personal gain, rather than paying financial obligations that East End was otherwise unable to meet.

Similarly, the PSR occasionally states that "none" of East End's accounts "had money in them" (PSR ¶¶ 11, 15, 17).  This description obscures the fact that East End was a legitimate and important community-based business before, during, and after the offense conduct.  It continued to receive funds from lawful sources including payments from school districts; loans from hard money lenders; and the proceeds of a loan that Mr. Mensch took out a loan against the remaining equity that East End held in its fleet of school buses.

Accordingly, in addition to the specific objections regarding the offense conduct (which are set forth below), on behalf of Mr. Mensch, I request that the following changes be made:

- **PSR ¶ 8:** East End's financial distress was caused by, among other things, the company's reliance on merchant cash advance companies, otherwise known as "hard money lenders," which charged illegally usurious rates of interest, as well as a significant dispute involving the amount East End was owed by the William Floyd School District, its largest account.

- **PSR ¶ 11:** The conclusion of the first sentence should be changed from "none of the accounts at either bank had money in them" to read "the accounts lacked sufficient funds to cover the amount written on the check." The second sentence should be changed from "Mensch and Jacinto had multiple accounts…" to read "It is noted that East End had multiple accounts at each financial institution."

- **PSR ¶ 12:** In the first sentence, the phrase "were not immediately made available to Mensch and Jacinto" should be modified to read "were not immediately made available to East End."

- **PSR ¶ 15:** The conclusion of the sixth sentence should be changed from "none of the accounts at either bank had money in them" to read "the accounts lacked sufficient funds to cover the amounts written on the checks."  The eighth sentence should read "**Mr. Mensch** also had the highest-level of decision-making and control in his role as the owner of East End, with the funds from the fraud being used at his discretion to fulfill East End's obligations that it was otherwise unable to meet."

- **PSR ¶ 17:** The conclusion of the sixth sentence should be changed from "none of the accounts at either bank had money in them" to read "the accounts lacked sufficient funds to cover the amounts written on the checks."

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 4

**SPECIFIC OBJECTIONS**

**PSR ¶ 8:**       Between January 2017 and September 2018, Mensch and Jacinto, together with others, devised and executed a scheme to defraud BNB and Wallkill by passing fraudulent checks between East End's various accounts to keep East End operational despite being effectively insolvent. This fraudulent practice was known as "check-kiting" and was intended to exploit expedited check-clearing privileges provided by those financial institutions.

Mr. Mensch objects to Paragraph 8 to the extent that it suggests the offense conduct took place between January 2017 and September 2018, rather than between October 2017 and September 2018.  East End first opened accounts at BNB and Wallkill in March 2017 and May 2017, respectively, and significantly did not begin the practices described in this paragraph, *i.e.*, depositing intracompany checks that were then covered by other intracompany checks, until October 2017.

Accordingly, on behalf of Mr. Mensch, I request that the first clause of Paragraph 8 be revised to read "Between October 2017 and September 2018…"

**PSR ¶ 9:**       As part of the scheme, Mensch and Jacinto drew checks on East End's accounts at BNB, knowing that those accounts did not contain sufficient funds to cover the checks. Mensch and Jacinto deposited those checks into East End's accounts at Wallkill, where, on an expedited basis, provided Mensch and Jacinto with access to funds matching the purported value of the checks. Despite knowing that they did not have sufficient funds to cover the checks, Mensch and Jacinto withdrew those funds to meet various financial obligations incurred by East End that East End was otherwise unable to meet. Mensch and Jacinto drew 885 checks from BNB to Wallkill, totaling approximately $347,668,442.21.

Mr. Mensch objects to this description of the offense conduct for the following reasons. *First*, without minimizing Mr. Mensch's role, it does not include important details regarding Dr. Jacinto's role, which may be helpful for Judge Choudhury in evaluating an appropriate sentence, *see* 18 U.S.C. § 3553(a)(6).  Dr. Jacinto is an experienced CPA and college professor with years of professional experience in the school bus business.  *Second*, as noted above, this paragraph states that "Mensch and Jacinto" were provided with access to funds, when in fact the immediate access was provided to East End corporate accounts (such that funds were available to pay obligations of the companies).  *Third*, by focusing on the total face value of all checks written during the offense conduct (the "Total Face Value Figure"), as opposed to the significantly smaller value of the checks that were outstanding at any given time, this paragraph overstates the scope of the criminal conduct.  Providing additional information about the value of the checks outstanding at any given time, as well as information regarding how many of these checks were

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 5

written during the final months of the offense conduct, helps to put the Total Face Value Figure in appropriate context.

Accordingly, on behalf of Mr. Mensch, I request that this paragraph be modified as follows (with my requested additions indicated in bold):

> As part of the scheme, Mensch and Jacinto drew checks on East End's accounts at BNB, knowing that those accounts did not contain sufficient funds to cover the checks. **Jacinto calculated the daily transactions that would be necessary to maintain the "float" between Wallkill and BNB accounts. On a daily basis, she gave bus company employees (including Mr. Mensch) lists of checks to be issued and deposited either via email or handwritten note. Mr. Mensch knew of these instructions and the amounts being deposited. These instructions contained the specific amounts that needed to be deposited; which accounts the checks should be drawn on; into which accounts they should be deposited; and (on occasion) a specific time when the checks should be deposited. Dr. Jacinto also sent text messages with reminders or other instructions. If an intercompany check had not been deposited by a certain time, Dr. Jacinto would follow up with the employee directly to remind them to deposit the check or would ask Mr. Mensch to follow up. Mr. Mensch and Dr. Jacinto knew that the accounts at BNB did not contain sufficient funds to cover the checks being deposited at Wallkill.**
>
> **A lower-level employee working in upstate New York (the "Upstate Employee")** deposited those checks into East End's accounts at Wallkill, **which**, on an expedited basis, provided **East End** with access to funds matching the purported value of the checks. **On occasion, when the Upstate Employee was not available, Mr. Mensch would deposit the checks.** Despite knowing that they did not have sufficient funds to cover the checks, Mensch and Jacinto **used those funds in the normal course of business** to meet various financial obligations incurred by East End that East End was otherwise unable to meet. **East End drew a total of 885 checks from BNB to Wallkill, with over 90% of those checks being written between March 2018 and September 2018. The face value of these checks was approximately $347,668,442.21 in total, although the value of the checks outstanding at any given time was only a fraction of this figure.**

These requested additions (1) explain Dr. Jacinto's role in the offense conduct; (2) correctly note that East End, rather than Mr. Mensch and Dr. Jacinto personally, received the immediately available credit and more accurately describe the use of the funds by Mr. Mensch and Dr. Jacinto; and (3) provide relevant context for the Total Face Value Figure.

**PSR ¶ 10:**  Before the checks were dishonored, and to conceal the fraudulent nature of the transaction, Mensch and Jacinto conducted the same process in reverse, drawing checks on East End's accounts at Wallkill, which accounts likewise did not

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 6

> contain sufficient funds to cover the checks. Mensch and Jacinto deposited those checks into East End's accounts at BNB, where, on an expedited basis, provided Mensch and Jacinto with access to funds matching the purported value of the checks. Mensch and Jacinto also withdrew those funds to meet various financial obligations incurred by East End that East End was otherwise unable to meet. Mensch and Jacinto drew 974 checks from Wallkill to BNB totaling approximately $356,539,189.24.

Mr. Mensch objects to Paragraph 10 of the PSR for the same reasons as his objections to Paragraph 9. Accordingly, on behalf of Mr. Mensch, I request that this paragraph be revised as follows (with my requested additions indicated in bold):

> Before the checks were dishonored, and to conceal the fraudulent nature of the transaction, Mensch and Jacinto conducted the same process in reverse, drawing checks on East End's accounts at Wallkill, which accounts likewise did not contain sufficient funds to cover the checks. **Based on Dr. Jacinto's calculations regarding the transactions that would be necessary to maintain the "float" between Wallkill and BNB accounts, Dr. Jacinto provided daily instructions to other East End Employees regarding the checks to be issued from the Wallkill accounts and deposited into BNB accounts. Mr. Mensch knew of these instructions and the amounts being deposited. An unindicted co-conspirator in East End's accounting department worked under Dr. Jacinto and provided handwritten notes to another employee in the accounting department with explicit directions regarding the checks. As with the instructions regarding the BNB checks, Dr. Jacinto's emails or notes contained the specific amounts that needed to be deposited; which accounts the checks should be drawn on and deposited into; and (on occasion) a specific time when the checks should be deposited. Dr. Jacinto also sent text messages with reminders or other instructions. If an intercompany check had not been deposited by a certain time, Dr. Jacinto would follow up with the employee directly to remind them to deposit the check or would ask Mr. Mensch to follow up. Mr. Mensch and Dr. Jacinto knew that the accounts at Wallkill did not contain sufficient funds to cover the checks being deposited at BNB.**

> **East End employees (at times including Mensch)** deposited those checks into East End's accounts at BNB, **which**, on an expedited basis, provided **East End** with access to funds matching the purported value of the checks. Mensch and Jacinto **used those funds in the normal course of business** to meet various financial obligations incurred by East End that East End was otherwise unable to meet. **East End drew a total of 974 checks from Wallkill to BNB, 90% of which were drawn between March 2018 and September 2018. The face value of these checks was approximately $356,539,189.24 in total, although the amount of checks outstanding at any given time was a fraction of that figure.**

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 7

**PSR ¶ 11:**   The instant investigation revealed that on a daily basis, Mensch and Jacinto were writing checks from BNB to Wallkill and Wallkill to BNB, wherein none of the accounts at either bank had money in them. It is noted that Mensch and Jacinto had multiple accounts at each financial institution. Specifically, Mensch and Jacinto drew a check on BNB and deposited it into Wallkill so money from Wallkill could be withdrawn. A portion of this money would be used for expenses. Before the check could clear the BNB account, Mensch and Jacinto drew a check on Wallkill, but with a higher amount, to make up for the loss due to the expenses, and deposited it into the Wallkill account. Therefore, by the time the check cleared the BNB account, it appeared that the bank account had enough money in it. This process continued between both financial institutions, wherein the more checks that Mensch and Jacinto wrote, the larger the amounts on the checks had to be. The defendants were able to continue the check kiting process because the balances in the BNB and Wallkill accounts never reflected a negative balance because checks from the other bank were always being deposited to make the accounts appear that they had money in it.

In addition to the requested modifications described above in Mr. Mensch's General Objection Regarding Description of Offense Conduct set forth at pages 2-3 above, Mr. Mensch objects to the final sentence of Paragraph 11 as factually inaccurate: on occasion, the bank accounts did reflect negative balances, and Dr. Jacinto was generally responsible for assuaging any concerns raised by bank employees.  Accordingly, on behalf of Mr. Mensch, I request that the last sentence of this paragraph be amended as follows (with my requested changes indicated in strikethrough and bold):

> The defendants were able to continue the check kiting process ~~because the balances in the BNB and Wallkill accounts never reflected a negative balance~~ because checks from the other bank were always being deposited to make the accounts appear that they had **sufficient funds to cover the amounts written on the check**.  **Although the balances in the BNB and Wallkill accounts generally did not reflect a negative balance, the accounts were occasionally overdrawn notwithstanding the offense conduct.  When BNB or Wallkill employees had questions about transfers or overdrafts, they generally reached out to Dr. Jacinto or an unindicted co-conspirator who worked in the accounting office.**

**PSR ¶ 16:**   The guideline for this offense is USSG § 2B 1.1 (a)(2), which provides a base offense level of 6 because the offense of conviction has a statutory term of imprisonment of less than 20 years. Since the loss was $9,326,366.03, which is more than $3,500,000 but less than $9,500,000, 18 levels are added per USSG §2Bl.l(b)(1)(J). Since Mensch was an organizer and leader of a criminal activity that involved five or more participants, four levels are added per USSG §3B1.1(a).

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 8

Mr. Mensch objects to the application of the four-level role enhancement provided for in the third sentence of Paragraph 16. Notably, the government's calculation of the Guidelines, as reflected in Mr. Mensch's plea agreement and as stated during Mr. Mensch's plea hearing, included only a two-level role enhancement. Mr. Mensch has fully accepted responsibility for his conduct and stipulated to the application of that two-level enhancement in his plea agreement. A four-level role enhancement, however, is unwarranted, because the offense did not involve five or more participants, *i.e.*, "a person who is criminally responsible for the commission of the offense." U.S.S.G. § 3B1.1, Application Note 1.

Although five individuals were involved in the offense conduct, at least one of these individuals, a lower-level employee who worked for East End in Orange County, New York (the "Upstate Employee"), did not understand the fraudulent nature of the scheme, and therefore does not qualify as a "participant" for purposes of section 3B1.1. That individual's role was limited to depositing BNB checks in Wallkill accounts; she was not privy to the simultaneous deposit of Wallkill checks in BNB accounts and therefore did not understand the circular nature of the transactions. Accordingly, the Upstate Employee was an "unwitting" worker who did not have the requisite intent and therefore is not criminally responsible for the commission of the offense. *United States v. Leonard*, 37 F.3d 32, 38 (2d Cir. 1994) ("unwitting" grocery store workers who "performed activities that advanced… [a] cash-skimming scheme" were not "participants" because they lacked knowledge of the criminal nature of the scheme). Because the offense involved, at most, four participants, no basis exists for a four-level enhancement.

For these reasons, on behalf of Mr. Mensch, I request that the third sentence of Paragraph 6 be modified to read: "Since Mensch was an organizer and leader of a criminal activity, two levels are added per USSG §3B1.1(c)."[1]

**PSR ¶ 26:**   <u>**Adjustment for Role in the Offense:** The defendant was an organizer and leader of a criminal activity that involved more than five participants; therefore, four levels are added per USSG § 3B1.1(a).</u>

For the reasons set forth in our objection to Paragraph 16, *supra*, on behalf of Mr. Mensch, I object to the application of a four-level role enhancement set forth in Paragraph 26.

**PSR ¶ 40:**

---

[1] Should this request be implemented, the calculation of Dr. Jacinto's Guidelines calculation, as set forth in Paragraph 18, should also be amended.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 9



PSR ¶ 46:

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 10



**PSR ¶ 121:**   As a result of a felony conviction, defendants face a potentially broad range of collateral consequences. Numerous federal and state laws place various restrictions on defendants, many of which attach automatically upon conviction. Some of these collateral consequences include the denial of government benefits, ineligibility for public housing, suspension of student loans, revocation or suspension of driver's licenses, and the inability to enlist in the military, or to serve on a jury or to vote. The potential collateral consequences of a felony conviction are numerous and circumstance-specific. For further guidance, please

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 11

> see the American Bar Association's website at
> www.abacollateralconsequences.org.

On behalf of Mr. Mensch, I respectfully request that the following language be included in this paragraph to describe a collateral consequence unique to Mr. Mensch's situation:

> As relevant here, school bus transportation workers who come into contact with students must pass background checks in New York and New Jersey. *See* N.Y. Vehicle & Traffic Law Article 19-A; N.J. Admin. Code § 13-20-30.14. Mr. Mensch regularly drives buses to fill in for absent employees or otherwise ensure that Orange County Transit LLC and Montauk Transit LLC fully service their clients.. He expects that he will be disqualified from this role as a result of his conviction.

## FACTORS THAT MAY WARRANT A VARIANCE[2]

The plea agreement between the government and Mr. Mensch does not restrict Mr. Mensch from requesting a downward departure or a variance. Accordingly, on behalf of Mr. Mensch, I request that the Probation Office consider recommending a downward variance for the following reasons: (1) the school bus companies for which Mr. Mensch works depend on his service, and his incarceration would place their survival in question; (2) ███████████████████████████████████████████████████; (3) any sentence should account for the criminal conduct of the hard money lenders, who put Mr. Mensch and his business in an impossible position; (4) the need for specific deterrence is minimal, as demonstrated by Mr. Mensch's record since the offense conduct; (5) a Guidelines sentence will make it less likely that the victims receive full restitution; and (6) the need to avoid unwarranted sentencing disparities counsels in favor of leniency.

*First*, Mr. Mensch's "history and characteristics" support a downward variance because of the essential role he performs for Orange County Transit LLC and its affiliates (together,

---

[2] The 2025 Amendments to the Guidelines are expected to go into effect November 1, 2025, absent Congressional action. Pursuant to those Amendments, the departure provisions relating to specific personal characteristics have been deleted from the Guidelines (although they have been reproduced in an appendix for historical reference). *See* USSG App. C, amendment 836. Because these Amendments likely will be effective at the time of Mr. Mensch's sentencing, I have set forth factors supporting a downward variance, rather than a departure. To the extent that these Amendments are disapproved by Congress, I submit that these factors would also support a downward departure. *See id.* ("The Commission… intend[ed] that judges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)").

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 12

"Orange County") and the employees, school districts, and students who depend on him.  18 U.S.C. § 3553(a)(1); *United States v. Milikowsky*, 65 F.3d 4, 7-8 (2d Cir. 1995).

Mr. Mensch has worked in the school bus industry since high school, having learned the business from his father.  As a teenager, Mr. Mensch assisted with repairs, fueling, and other tasks around the bus yard, learning the operations side of the business from the ground up.  After leaving college, Mr. Mensch took on full responsibility for one contract—the Springs Union Free School District, PSR ¶ 67—and began developing the skills to interface with school districts, parents, and students.  Through this lifetime of experience, Mr. Mensch has not only developed an unparalleled understanding of school bus transportation, but has earned a reputation as a trusted and dependable partner to school districts.  No one other than Mr. Mensch has ever run the bus companies, and he is essential to their continued success.

Mr. Mensch oversees the daily operations of Orange County, managing the daily transportation of tens of thousands of students, the maintenance of Orange County's many vehicles and equipment, and the company's relationship with its many school district customers.  As a result, Mr. Mensch wears many hats and will jump in to solve whatever problems need his attention.  When drivers were sick or unavailable, Mr. Mensch personally drove buses, dispatching other routes from the driver's seat.  He has personally cleaned toilets, fixed buses, and pitched in on similar tasks in order to make sure this small business keeps functioning.

Furthermore, Mr. Mensch has been able to retain workers in the face of a nationwide bus driver shortage because of Orange County's good pay and benefits and, most important, Mr. Mensch's care and commitment to his employees, including by supporting employees who face health crises or other personal issues.  Currently, hundreds of workers are employed as a result of Mr. Mensch's efforts. *Id.* ¶¶ 86, 90.

As a result of Mr. Mensch's efforts and leadership, Orange County has been able to step in at short notice to provide emergency help to school districts when other transportation operators could not deliver, or when the school district could not provide those services itself.[3] In one notable example, Orange County stepped in when a competitor had difficulty staffing its special education routes, causing significant disruption to Sachem School District's most

---

[3] *See, e.g.*, "Sachem SD brings in additional bus company to help with transportation issues," News12 Long Island, Sept. 14, 2023, available at https://longisland.news12.com/sachem-sd-brings-in-additional-bus-company-to-help-with-transportation-issues; "Kingston school board hires Orange County Transit to take over 9 bus routes," Daily Freeman, Mar. 14, 2024, available at https://www.dailyfreeman.com/2024/03/14/kingston-school-board-hires-orange-county-transit-to-take-over-9-bus-routes/.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 13

vulnerable students.[4]  The parents of these children were so grateful for Orange County's intervention that they actually applauded upon hearing the news that Orange County's contract had been extended.[5]

The history of the bus companies both prior to and since the offense conduct demonstrates the importance of Mr. Mensch's role.  When the bus companies filed for bankruptcy in 2018, the most likely outcome was liquidation.  Indeed, other private school bus companies (including Mr. Mensch's prior business, PSR ¶¶ 66, 79) had dissolved after filing for bankruptcy.[6]  Through Mr. Mensch's hard work and dedication, however, the bus companies survived and remained a valued partner to school districts across New York and New Jersey.  Since 2018, Mr. Mensch was able to steer the companies not only through bankruptcy, but through the unique struggles of the COVID-19 pandemic and a nationwide bus driver shortage,[7] drawing on his lifetime of experience in the industry to pitch in for whatever roles the companies needed him to fulfill.

As the PSR already recognizes, Mr. Mensch performs a critical role for Orange County.  PSR ¶¶ 62, 70. Mr. Mensch's lifetime of experience in the school bus industry (PSR ¶¶ 21, 42, 62-64, 66-67) provides him with a unique ability to manage Orange County's relationship with school districts, supervise its employees, and ensure that Orange County remains a trusted and valued partner to school districts.  Orange County currently serves over twenty school districts, *id.* ¶¶ 85, 88, and transports over 33,000 students on a daily basis.  In addition to "big bus" routes that serve the majority of the students, Orange County provides special routes for students with

---

[4] "School bus problems for Sachem, other special education students," Newsday, Sep. 8, 2023, available at https://www.newsday.com/long-island/education/busing-issues-first-week-lxapjc7p.

[5] Sachem Schools, "October 25, 2023 Board of Education Meeting," available at https://www.youtube.com/watch?v=2XC0PAWPmag&t=2083s.

[6] *See* "Atlantic Express Shutting its Doors After Failed Union Negotiations," School Transportation News, Dec. 6, 2013, available at https://stnonline.com/news/atlantic-express-shutting-its-doors-after-failed-union-negotiations/ ("A month after filing for Chapter 11 bankruptcy protection, 40-year-old school bus contractor Atlantic Express is ceasing operations by the end of the year."); "Baumann Bus Company goes out of business due to coronavirus," News12 Long Island, April 29, 2020, available at https://longisland.news12.com/baumann-bus-company-goes-out-of-business-due-to-coronavirus-42069569.

[7] "Schools Returning To In-Person Learning Face Bus Driver Shortage," National Public Radio, Aug. 1, 2020, available at https://www.npr.org/2020/08/01/898184559/schools-returning-to-in-person-learning-face-bus-driver-shortage; "As Schools Reopen, Districts Are Desperate for Bus Drivers," N.Y. Times, Aug. 27, 2021, available at https://www.nytimes.com/2021/08/27/us/school-bus-drivers-shortage.html.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 14

disabilities, who need specialized or even personalized transportation, as well as students who have become homeless and need to be transported to their home district from temporary housing (and who therefore also require specialized or personalized transportation). In providing these services, Mr. Mensch draws on both his industry experience ████████████████████████. These efforts have earned Mr. Mensch trust and respect from the many school districts served by Orange County.

Mr. Mensch continues to serve in this same critical role even though he is no longer the owner of Orange County. PSR ¶ 62. He is the critical day-to-day manager of the bus companies' operations. His wife (who currently owns the business) recognizes that while she "could" manage the business on her own, it would be "difficult" for her to do so. *Id.* Orange County has never been run by anyone other than Mr. Mensch, and his wife has never run a school bus company on her own.

Accordingly, Mr. Mensch's "history and characteristics" show that he is essential to Orange County, therefore creating the unacceptable risk that a term of incarceration for Mr. Mensch would result in the failure of Orange County, resulting in devastating collateral consequences for hundreds of employees, over twenty school districts, and tens of thousands of students and their parents. As the Second Circuit and numerous courts in this district have recognized, leniency is warranted when the survival of a business and its employees' livelihoods depend on the defendant, because a court should endeavor "to reduce the destructive effects that incarceration of a defendant may have on innocent third parties." *Milikowsky*, 65 F.3d at 7; *see, e.g., United States v. Gorodetsky*, 288 F.R.D. 248, 249-50 (E.D.N.Y 2013); *United States v. Khalid*, 2011 WL 6967993, at *2 (E.D.N.Y. Dec. 13, 2011); *United States v. Romano*, 2008 WL 4427759, at *1 (E.D.N.Y. Sept. 16, 2008). This reasoning is even more compelling here because employees are not the only ones who depend on Mr. Mensch. Orange County also serves thousands of students (including many who are homeless or have special needs) and their parents. *Cf. Gorodetsky*, 288 F.R.D. at 249-50 (noting that sustained operation of the defendants' business, an asbestos removal service, would "protect[] both employees and the public").



MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 15



*Third*, the "nature and circumstances of the offense" support a downward variance because of the hard money lenders' critical role in exacerbating the circumstances that led to the offense conduct. 18 U.S.C. § 3553(a)(1). Since the offense conduct ended, hard money lenders have been pursued by state and federal regulators, leading to significant judgments and settlements. These efforts even included a federal criminal investigation, which reportedly stalled after President Trump pardoned one lender who was considering cooperating with the government.[9] Such efforts, however, came too late for Mr. Mensch and East End.

East End had not used hard money loans before the experienced Dr. Jacinto began working there in February 2016. Mr. Mensch relied on Dr. Jacinto's greater financial expertise and initially believed that taking on these loans was an appropriate business strategy. As

---

[8]

[9] *See* Michael S. Schmidt et al, "A Troubling Trump Pardon, and a Link to the Kushners," N.Y. Times, Nov. 26, 2023, available at https://www.nytimes.com/2023/11/26/us/politics/trump-pardon-braun.html.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 16

described in Paragraphs 20, 70, and 72 of the PSR, however, the hard money lenders charged Mr. Mensch and his businesses illegally usurious interest rates and subjected Mr. Mensch to unrelenting intimidation and threats of destruction.  Feeling he had no other options, Mr. Mensch approved East End's continued use of hard money loans, signing personal guarantees for each of the loans the bus companies took out.  Despite Mr. Mensch's hard work, the continued use of hard money loans throughout the fall of 2017 put East End on the brink of insolvency, creating the conditions that led to the offense conduct.  As the offense conduct continued, the hard money lenders exacerbated East End's financial distress through their abusive conduct, including deducting hidden fees, charging usurious interest, and even taking money to which they were not entitled.

As a condition of these loans, East End had to surrender control over its own bank accounts: the hard money lenders were permitted to directly debit from these accounts.  The hard money lenders abused this absolute authority to extract as much money as they could from the bus companies.  Through a Freedom of Information Law request to the New York Attorney General, we have identified one concrete example of a hard money lender's abuse of the bus companies.  In May 2018, East End took out a hard money loan from Yellowstone Capital, permitting Yellowstone to make daily withdrawals of $14,990.  *See Yellowstone Capital LLC v. East End Bus Lines, Inc. et al.*, Index. No. 617824/2018, NYSCEF Doc. No. 3 (Suffolk Cty. Sup. Ct. Sep. 13, 2018).  In July 2018, however, Yellowstone doubled this charge, increasing its daily pull to $29,997.  Internal Yellowstone emails show that a lower-level employee raised concerns about this apparent shift, stating "Payment should be 14,997 a day, not 29,997".  Ex. 1.  In response, Steve Davis—the self-described "Director of Underwriting" at Yellowstone[10]—stated "No chance… merchant is about to go bad." *Id.*[11]  He then stated he would call Dr. Jacinto about the issue.  *Id.*  It therefore appears that, with full knowledge that the bus companies were "about to go bust," *id.*, Yellowstone unilaterally *doubled* the amount it was withdrawing from the bus companies' accounts.  Ultimately, Yellowstone collected approximately $525,000 more than it was entitled to collect pursuant to the original payment schedule before the Bus Companies filed for bankruptcy.

---

[10] *See* Deposition of Steve Davis, *People v. Yellowstone Capital LLC et al v.* Index No. 450750/2024, NYSCEF Doc. No. 11 at 57:21-58:15 (N.Y. Sup. Ct. Mar. 5, 2024).

[11] The day after Mr. Davis sent this email, he reportedly called another merchant who had borrowed from a Yellowstone entity and was unable to make payments.  *See* Affidavit of Jerry W. Bush, Jr., *People v. Yellowstone Capital LLC et al v.* Index No. 450750/2024, NYSCEF Doc. No. 32 ¶ 59.  According to the merchant, Mr. Davis "said that the only way I was going to get out of paying the debt… was if I won the lottery or if I was dead, because [Mr. Davis] could not collect money from a dead body."  The merchant then tried to overdose on oxycodone.  *Id.* ¶ 61.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 17

Although he knew of and approved the use of hard money lenders out of desperation, Mr. Mensch was nevertheless a victim of their criminal acts. East End and the other entities that took out hard money loans have been expressly recognized as such by the New York Attorney General. PSR ¶ 72. Mr. Mensch knows that the hard money lenders' unlawful actions do not excuse his own actions. I submit, however, that their abuse of Mr. Mensch provides critical context for why the offense conduct transpired and should be taken into account.[12]

*Fourth*, Mr. Mensch's record since the offense conduct demonstrates that the need for specific deterrence is limited, and there is no need to "protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B)-(C). The charged scheme ended in September 2018. PSR ¶ 8. In the more than seven years since, Mr. Mensch has followed the law and worked to be a productive member of society. He is devoted to his family and his work, and he deeply regrets that his past behavior now puts both at risk. Moreover, as the PSR recognizes, Mr. Mensch has abided by all the conditions of his release since pleading guilty more than a year ago. *Id.* ¶ 3.

*Fifth*, the "need to provide restitution to any victims of the offense" supports the application of a downward variance. 18 U.S.C. § 3553(a)(7). As described above, Mr. Mensch is critical to the continued success of Orange County. Indeed, these companies are only operational today because of Mr. Mensch's extraordinary efforts to steer them through bankruptcy and other crises. As I explained in my letter of October 10, 2025, but for Mr. Mensch's success in restoring Orange County's financial stability, no possibility would exist that Wallkill and BNB could be made whole. Orange County is currently making combined restitution payments of nearly $50,000 a month and expects to make payments of more than $70,000 a month after November 2030. These significant payments, which far outstrip the amount that Mr. Mensch could pay through his own salary or assets, depend on the continued success of Orange County. As explained above, that success will likely end if Mr. Mensch is sentenced to a term of incarceration.

*Sixth*, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" also weighs in favor of a downward variance. 18 U.S.C. § 3553(a)(6). I believe only one matter involves truly "similar conduct," including an analogous amount of loss, and a defendant with a "similar record[]": *United States v. Saquib Khan*, No. 13 Cr. 268 (E.D.N.Y.). In that matter, a judgment of probation was imposed, conditioned on the defendant making full efforts to satisfy the restitution order.

---

[12] To the extent that the 2025 Amendments are disapproved by Congress, I submit that these facts would support the application of a downward departure pursuant to U.S.S.G. § 5K2.12 (Coercion and Duress). Although I understand that "economic pressures upon a trade or business do not warrant a downward departure," the unlawful actions of the hard money lenders, which at times included outright stealing money from the bus companies, went beyond mere economic pressures.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 18

Like Mr. Mensch, Mr. Khan was a small business owner under significant financial pressure. Mr. Khan owned a small wholesale grocery store business in Staten Island that had difficulty obtaining loans through traditional sources, but which had been granted same-day clearing privileges on its checking accounts. As the prosecution explained at Mr. Khan's sentencing hearing, Mr. Khan ultimately "began the process of cycling through… checks to get at least short-term advances on money that he could cover either with another check or with the proceeds of his businesses coming in." Transcript of Sentencing, *United States v. Khan*, No. 13 Cr. 268, ECF 37 at 5:10-13 (E.D.N.Y. Nov. 19, 2014). When these financial pressures did not abate, however, Mr. Khan continued to pass circular checks, "hoping that the business would expand and eventually he'd be able to pay these people off." *Id.* at 7:21-22. Mr. Khan's defense counsel explained that Mr. Khan—like Mr. Mensch—had borrowed money from legitimate sources in order to keep the business afloat, but ultimately used the same-day funds provided to him by the banks "so that he could pay his suppliers and his employees." *Id.* at 18:7-9. The prosecution agreed that Khan was not a "classic kiter" who "writes a check for a boat and then drives it away[.]" *Id.* at 7:8-9. The same is true of Mr. Mensch. As the PSR already recognizes, Mr. Mensch sought to keep a struggling business afloat to ensure that his employees would be not be left without a job. PSR ¶¶ 8, 48.

The scale of the losses in Mr. Khan's case further shows that it involved "similar conduct" as in Mr. Mensch's case. The banks that cleared Mr. Khan's checks ultimately lost $4.7 million, resulting in an eighteen-level Guidelines enhancement pursuant to U.S.S.G. § 2B.1.1(b)(1)(J)—the same eighteen-level enhancement applicable to Mr. Mensch. *See* Government's Sentencing Submission, *United States v. Khan*, No. 13 Cr. 268, ECF 33 at 3 (E.D.N.Y. Sep. 4, 2014).

Finally, Mr. Khan and Mr. Mensch have "similar records." Like Mr. Mensch, Mr. Khan had no criminal history and fell in Criminal History Category I. Government's Sentencing Submission, *United States v. Khan*, No. 13 Cr. 268, ECF 33 at 1, 5. (E.D.N.Y. Sep. 4, 2014).

Through its evaluation of the Guidelines, including the same eighteen-level enhancement applicable to Mr. Mensch, the district court in Mr. Khan's case determined that Mr. Khan's adjusted offense level was 26, which resulted in a Guidelines range of 63 to 78 months. Transcript of Sentencing, *United States v. Khan*, No. 13 Cr. 268, ECF 37 at 14:12-18 (E.D.N.Y. Nov. 19, 2014). Based on its consideration of the Section 3553(a) factors, however, the district court imposed a downward variance and ultimately sentenced Mr. Khan to probation. The district court described Mr. Khan's case as "unusual," observing that even though there was "clear deception," there "was not necessarily any intention to impose the losses on the banks," as "the hope was that he would be able to cover them." *Id.* at 7:25-8:7. In pronouncing judgment, the Court explained that the victim banks' "interests will be better served with you in the community" and conditioned the judgment of probation on Mr. Khan making his best efforts to comply with the Court's restitution order and performing community service. *Id.* at 32:12-18.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 19

Given Mr. Mensch's similar lack of any prior criminal history and the similarities between Mr. Khan's conduct and the conduct to which Mr. Mensch has pleaded guilty, including their similar Guidelines ranges and adjusted offense levels, the sentence presently recommended by the Probation Department would create "unwarranted sentence disparities" between similarly situated defendants. Mr. Khan's case therefore also counsels in favor of a downward variance here.

## CLARIFICATIONS AND ADDITIONAL CONTEXT



MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 20



MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 21



MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 22



MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 23



MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 24



MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 25



MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 26



MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 27



**CORRECTIONS**

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

United States Probation Officer Meghan Wing
October 27, 2025
Page 28



## CONCLUSION

I would like to reiterate that I am grateful for the extensive time and attention you have devoted to Mr. Mensch's case. Please feel free to contact me if you have any questions about Mr. Mensch's responses and objections to the PSR.

Respectfully submitted,

/s/ Robert J. Anello
Robert J. Anello

Enclosure

cc:        Assistant United States Attorney Anthony Bagnuola (via email)
           Assistant United States Attorney Adam Toporovsky (via email)